## UNITED STATES v. APPALACHIAN ELECTRIC POWER CO.
### No. 4460.

Circuit Court of Appeals, Fourth Circuit.
Nov. 6, 1939.

PARKER, Circuit Judge, dissenting.

John W. Aiken, Sp. Ass't to Atty. Gen., David W. Robinson, Jr., Gen. Counsel, Federal Power Commission, of Columbia, S. C., and Gregory Hankin, Sp. Counsel, Federal Power Commission, of Washington D. C. (Richard J. Connor, Ass't Gen. Counsel, Willard W. Gatchell, Principal Atty., and Howard E. Wahrenbrock, Senior Atty., Federal Power Commission, all of Washington, D. C., on the brief), for appellant.

Raymond T. Jackson, of Cleveland, Ohio, Wendell W. Forbes, of New York City, and John L. Abbot, of Lynchburg, Va. (M. F. Millikan, A. Henry Mosle, Creswell M. Micou, Fraser M. Horn, and M. W. Belcher, Jr., all of New York City, on the brief), for appellee.

Clarence W. Meadows, Atty. Gen. of West Virginia, and Abram P. Staples, Atty. Gen. of Virginia, amici curiæ.

Before PARKER and NORTHCOTT, Circuit Judges, and CHESNUT, District Judge.

CHESNUT, District Judge.

The question for decision is whether the Appalachian Electric Power Company, a Virginia corporation (the defendant below and the appellee here) should be enjoined from the construction of a hydro-electric power dam in the New River at Radford, Virginia. To obtain this injunction the United States filed its complaint on May 6, 1935, in the District Court of the United States for the Western District of Virginia, in which it charged that the erection of the dam would be in violation of sections 9 and 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401, 403, 33 U.S.C.A. §§ 401, 403, and also contrary to the provisions of sec-

tions 4(d) and 23 of the Federal Water Power Act of 1920, 16 U.S.C. §§ 791–823, 16 U.S.C.A. §§ 791–823, which was amended August 26, 1935, 49 Stat. 838, 16 U.S.C.A. § 791a et seq.

Section 9 of the Rivers and Harbors Act provides in part that—

"It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War."

And Section 10 provides in part that—

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States. is hereby prohibited."

Under this statute it was necessary to obtain an Act of Congress to authorize the construction of a hydro-electric power dam in a navigable water of the United States, but by the Federal Water Power Act of June 10, 1920, 41 Stat. 1077, 16 U.S.C. Ch. 12, §§ 791–823, 16 U.S.C.A. §§ 791–823, Congress created an administrative commission with authority to issue licenses to construct, operate and maintain "dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation, and for the development, transmission, and utilization of power across, along, from or in any of the navigable waters of the United States", 16 U.S.C.A. § 797(d), such licenses (section 803) to contain certain specified conditions, some relating to matters affecting navigation and others of an economic and financial nature; and with the further proviso that the Commission in its discretion might waive any of the conditions except the license period of 50 years, if the license was "for a minor part only of a complete project." Under the original Act of 1920, 16 U.S.C.A. § 792, the Commission was composed of the Secretaries of War, Interior and Agriculture; but by amendment of June 23, 1930, 46 Stat. 797, the personnel of the Commission was changed to five commissioners appointed by the President by and with the advice and consent of the Senate.

Upon procedure provided for in the Act, the Commission approved the construction of the dam at Radford in accordance with the plans and specifications therefor which had been approved by the Chief of Engineers and by the Secretary of War with respect to navigation, and formally tendered to the Appalachian Electric Power Company, a so-called "major" license containing all the conditions enumerated in section 10 of the Act, 16 U.S.C. § 803, 16 U.S.C.A. § 803. The Company expressed its willingness to accept the license with all proper regulations affecting navigation but requested the Commission to waive other conditions not affecting navigation, particularly those which related to the regulation of rates to be charged for electric power, the setting aside thereout of amortization reserves, and the so-called "recapture clause" giving to the United States the right to take over the project at the expiration of the license period of fifty years upon the basis of original cost less amortization reserves. Among its objections to these latter conditions the Company made the point that the Commission was without constitutional authority to prescribe conditions other than those affecting navigation. The Commission refused to waive any of the conditions of the major-part license; and thereupon the Company, having acquired 'all riparian and overflowage rights and specific and full authority from the State of Virginia, proceeded toward the erection of the dam without obtaining a license from the Commission. The injunction suit followed.

In its complaint the Government took the position that the New River throughout its whole course constituted navigable waters of the United States, and therefore the dam could not be constructed without permission from Congress or a license from the Commission; and further, that the construction and operation of the dam would necessarily be an obstruction to the navigable capacity of waters of the United States; and in any event was prohibited by the Federal Water Power Act unless licensed by the Commission. The answer of the defendant controverted all three of these propositions.

*Proceedings before this suit:* The proceedings before the Commission ran over a period of several years. Section 23 of the Federal Water Power Act of 1920, 16 U.S.C.A. § 817, provided that persons intending to construct a dam in a stream "other than those defined in this chapter as navigable

waters, and over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States, may in their discretion file declaration of such intention with the commission", and if after investigation the Commission should find that the interests of interstate or foreign commerce would not be affected, permission was granted for the construction; otherwise not without a license granted by the Commission. The original project for the Radford Dam was initiated by a predecessor of the Appalachian Electric Power Company, the New River Development Company, which filed its declaration of intention with the Commission on June 25, 1925, after first obtaining an opinion from Engineers of the War Department that the river was not navigable, and therefore in its view not subject to the jurisdiction of the Commission. The declaration stated among other things that "the proposed project will be so constructed and operated so as not to impair the navigable capacity of the stream below, nor to affect the interests of interstate or foreign commerce". Thereupon the Commission requested a report on the declaration from the Chief of Engineers of the War Department, Gen. Harry Taylor. His report of August 20, 1925 was to the effect that no sufficient reason was seen why the Commission should not exercise jurisdiction over the proposed project because while there was no present navigation on the river there had been some on parts of the river in the past and the Government had done work on certain parts of the river to improve navigability; and the water-flow from the dam if not properly regulated could have an adverse effect on navigation during low water stages in the Kanawha River; but that such possible adverse effect was not such as to warrant refusal to permit the construction of the dam if control was maintained by the United States. On October 24, 1925 the declarant wrote to the Commission requesting re-consideration by Gen. Taylor of his report and submitting additional data relating to New River, which he said had not been considered in his original report. Thereafter General Taylor re-considered the matter and rendered a second report to the Commission on December 29, 1925, in which he said:

"A careful study has been made of all the data presented by the declarant and a further study has been made of all available data and records bearing on the question at issue which are available in this office, or which could be obtained from other government bureaus. The following report is the result of the additional studies which have been made and the additional information which has been obtained since the date of my original report."

In conclusion he stated:

"I therefore, report that in my opinion New River in its present condition is not a navigable stream and that navigation on the Kanawha River will not be adversely affected by the proposed power development."

On March 2, 1926 the Power Commission held a hearing on the declaration of intention as to the building of the power dam. The only evidence then submitted was the second report of Gen. Taylor, but there was argument by counsel for the Company and by the Attorney General of Virginia who appeared in opposition to the assumption of jurisdiction over the project by the Federal Power Commission. On April 17, 1926 the Commission transmitted to Gen. Taylor certain data with respect to the Pitt River in California which was considered as having a bearing on the question of the effect upon navigation on the Kanawha River by variations in the discharge of water from the Radford Dam, and requested his opinion thereon. On July 23, 1926 Gen. Deakyne, Acting Chief of Engineers, replied that the data with regard to the stream flow of the Pitt and Sacramento Rivers in California afforded no reliable comparison for New River by reason of different conditions, and that the correct procedure would be to study the action of waves in New River produced by discharges from dams then operating on the river. He referred to a very exceptional dry summer of 1925 and suggested the possibility that exceptionally dry seasons may occasionally occur during which the Radford Dam if unregulated might adversely affect the navigable capacity of the Kanawha River. [1]

The declaration which had been filed by the New River Company was assigned to and adopted by the Appalachian Company with the consent of the Commission on August 30, 1926, and on September 2, 1926 the Appalachian Company filed an application for a license on the Commission's suggestion that it would expedite matters and could be withdrawn if it later developed

---

[1] The experiments suggested by Gen. Deakyne subsequently made on New River were discussed in the opinion of the district judge.

that no federal license would be required. Pursuant to custom the District Engineer of the War Department gave public notice for a hearing at Radford on October 28, 1926, but no evidence was then introduced. Thereafter the District Engineer made a report on December 22, 1926 favorable to the issuance of the license. On June 1, 1927 the Commission made a finding that the New River "is not 'navigable waters' within the definition thereof in said Act", but that the interests of interstate and foreign commerce would be affected by such proposed construction. It was not stated in what respect interstate commerce would be affected by the dam; but it appears that the Commission had reference to the effect on navigability of the Kanawha River; and the action of the Commission in that regard seems to have been based principally on its consideration of the data regarding the California rivers. On July 1, 1927 the Commission tendered a full "major" license to the Appalachian Company. On April 26, 1928 the Company wrote the Commission that it was willing to accept all conditions reasonably designed to protect the navigability of the waters of the United States, and to be controlled by any reasonable rules and regulations which the Secretary of War might prescribe in the interests of navigation, but that unless the Commission could issue a license, the conditions of which related solely to navigation, the Company would proceed with the construction of its dam without obtaining a license from the Commission. The letter also requested reference of certain questions of law to the Attorney General of the United States. This request was not acted on at the time; and on February 4, 1930 the Company again wrote the Commission asserting its position that its project as operated would not affect navigable waters and therefore was not within the jurisdiction of the Commission and asking re-consideration of the subject, but nevertheless suggesting that if the Commission still asserted jurisdiction the Company would be willing to accept a so-called "minor-part" license containing only such conditions as would protect the interests of the United States in navigation. The letter enclosed a memorandum or brief in support of the authority of the Commission to grant such a license. On July 21, 1930 the Commission requested the opinion of the Attorney General of the United States as to its authority to issue a so-called

minor-part license, and in formulating the question stated that "New River is neither navigated or navigable in fact". On September 22, 1930 Attorney General Mitchell in an extended opinion advised the Commission that it could properly do so. He said:

"This interpretation appears necessary in order to avoid serious questions regarding the constitutionality of the Act which might be presented if section 10(i) should be interpreted so as to have no application to projects constructed in or on non-navigable streams, which only remotely and indirectly affect the navigability of waters in the lower reaches of streams to which they are tributaries." [1A]

On October 6, 1930 the Appalachian Company requested action on its application for a minor-part license and submitted revised maps and plans for the project on October 16, 1930. On October 31, 1930 the Commission forwarded to the Company a draft of a minor-part license and on November 6, 1930 a revised draft of the same. This omitted the objectionable conditions as to rates, amortization reserves and recapture. The Company replied that the form was satisfactory and that if license was tendered it would at once begin construction work. In the meantime the draft of minor-part license had been submitted to the Acting Chief Counsel for the Commission who submitted a memorandum disapproving its issuance because it was not sufficiently shown that the Company had complied with the laws of Virginia and in his opinion it did not adequately protect the interests of the United States; and that the previous finding of the Commission that the river was not navigable waters of the United States was incorrect and should be reversed. The memorandum of counsel was submitted to the Chief Engineer of the Commission who replied in an extended memorandum not agreeing with the views expressed, and the Commission then re-submitted the question of navigability of the river to the then Acting Chief Engineer of the War Department, Gen. Brown, enclosing the memorandum of the Acting Chief Counsel of the Commission, and that of its Chief Engineer. Gen. Brown replied that after reviewing the data there was no reason for changing the previous report of his office dated December 29, 1925, saying "it is my opinion that New River is not navigable at any point

---

[1A] Section 10(i) related to issuance of minor-part licenses.

in its course". On October 18, 1930 Major Herman, the District Engineer for New River, had submitted a report in reference to a particular inquiry as to the navigability of New River at certain points in which he concluded: "It is the District Engineer's opinion, therefore, that New River is not navigable in fact either at Jackson's Ferry or Glenlyn, or at any other point in its course". On October 24, 1930, Col. Spaulding, the Division Engineer for New River, expressed his full concurrence with Major Herman's opinion. The Company submitted to the Commission an official letter from the Governor of Virginia stating that the Company had complied with Virginia laws for the construction of the project.

On November 25, 1930, at a meeting of the Commission, consideration was given to the issuance of the minor-part license and "after due consideration the Commission declined to take action on the application, favorable or adverse. It was concluded that in view of the importance of the questions of jurisdiction as between the United States and the State of Virginia involved in this case a court adjudication is desirable." At the Commission's meeting on January 26, 1931 (the personnel of the Commission having changed pursuant to the amendment of the Act above referred to) the subject was again brought up and, in view of "the extreme importance of the legal questions involved" the Commission determined to hold another public hearing, notice for which was given for February 16, 1931. At that hearing attorneys for the Company and for several States submitted arguments and briefs respecting the interpretation of the Power Act, and the constitutional power of the federal government with regard thereto, and the authority of the Commission to issue a minor-part license. No evidence was introduced. On April 3, 1931 the Commission filed an opinion and order denying the application for a minor-part license, and directing that the Appalachian Company be tendered a standard form license under the Act, and ordering that it should not proceed with construction without such license. A minority of the Commission then favored a reversal of the former finding that the river was not navigable waters, but the majority were of the opinion that that question was one for the courts; that any finding of the Commission in that respect would not be binding upon the courts; and that the jurisdiction of the Commission was properly based upon section 23 of the Power Act above referred to.

Thereafter on June 8, 1931 the Appalachian Company filed suit in the United States District Court for the Western District of Virginia against the individual members of the Commission to remove a cloud on the title to their land and to restrain the defendants from interfering with the Company's use of its property. The case was dismissed by the District Judge on the legal insufficiency of the complaint, but on appeal to this court the case was dismissed for lack of personal jurisdiction over the defendants. Appalachian Electric Power Co. v. Smith et al., 4 Cir., 67 F.2d 451, 458. While the case was pending in the District Court the Commission on October 12, 1932 adopted a resolution which, after referring to the pending case and the contentions of counsel therein as to the navigability of the New River, and the findings and action of the Commission with respect thereto, stated—"The Commission finds and declares that New River, from the mouth of Wilson Creek, Virginia, north, is navigable waters within the definition thereof, as set forth in section 3 of the Federal Water Power Act", 16 U.S.C.A. § 796. This last action of the Commission was not taken after notice or hearing additional evidence.

*The issues in the present suit:* The Appalachian Electric Power Company began construction work on the dam about June 1, 1934. The bill of complaint in this case was filed May 6, 1935 to enjoin construction of the dam, averring that "New River is a navigable interstate stream arising in North Carolina and flowing in a northerly and northwesterly direction across the State of Virginia, into West Virginia, to the junction of Gauley River and New River, from which point it becomes known as the Kanawha River"; that the dam would constitute an obstruction to navigation and its construction was in violation of the two Acts of Congress above mentioned. The answer of the defendant denied these contentions. The principal and controlling issues presented by the pleadings are therefore (1) whether the New River at Radford, Virginia, constitutes navigable waters of the United States; (2) if not, whether the construction and maintenance of the dam will naturally and necessarily obstruct or substantially impair the navigability of any other navigable waters of the United States .

and particularly those of the Kanawha River into which New River flows, or the Ohio River, into which the Kanawha flows; and (3) if neither of these facts is found, whether the defendant's actions are in violation of the Federal Power Act. There are some subordinate or incidental issues of law involved in these major propositions, one of which is the contention that the Commission's declaration of October 12, 1932 constituted a finding of fact that the New River is navigable; was based on substantial evidence, and therefore was conclusive in the case. There is also the contention by the Appalachian Company that there is no constitutional basis for the economic and financial conditions of the so-called major license contained in the Power Act as they do not in any way relate to navigation.

There was a lengthy trial of six weeks or more in the district court and a very voluminous record has resulted.[2] Much testimony was introduced regarding the physical characteristics of New River throughout its course and in particular stretches; concerning its history from its original discovery late in the seventeenth century; its use or lack of use for navigation during its history; the roadways and railroads touching it; the produce or commerce of the neighboring country; the natural and usual or normal methods of operation of a hydro-electric dam; the possible or probable or intended method of operation of the particular Radford Dam; and the effect, if any, that the discharge or lack of discharge of water therefrom would have upon the lower stream. The greater part of the extensive testimony was given before and orally heard by the district judge, and there was also a large amount of documentary evidence relating to the history and physical characteristics of the river, and reports of engineers of the War Department with respect to conditions found during the brief period of expenditure of government funds on strictly localized portions of the river, and proceedings before the Power Commission. The evidence also contains very numerous exhibits including many photographs of the river at various points, and maps and plats.

After the trial and consideration of briefs of counsel, the district judge filed an extended opinion reported in 23 F.Supp. 83, in which he discussed the issues of law and fact and separately made specific findings of fact and conclusions of law. On the controlling facts he found—

"13. The New River is not a navigable water of the United States, either at the site of defendant's project or elsewhere throughout its course. The site of defendant's project is approximately 152 miles above the mouth of New River and approximately 160 miles above the head of navigation on the Kanawha River.

"15. The construction of the defendant's project will not obstruct the navigable capacity of the Kanawha River or of any navigable water of the United States. And the operation of defendant's project in any normal, rational, or probable method of operation will not obstruct or impair the navigable capacity of the Kanawha or any navigable water of the United States and will not affect the interests of interstate commerce."

On issues of law he determined that the New River is not a navigable water of the United States; that findings made by the Power Commission are not final, but in each case are subject to the determination of the courts; that the proper construction of the Power Act did not vest in the Commission the authority to require a license for a project in a non-navigable stream; that even if the Commission had power to require some license for a power dam in non-navigable waters of the United States, it could not validly impose therein conditions having no relation to navigable capacity of any navigable water of the United States; and that its action in seeking to impose upon the defendant the full major-part license in this case without constitutional authority to do so, bars its right to the relief prayed for; and that the bill of complaint should be dismissed as without equity. By the decree of May 10, 1938 the bill was dismissed, but the opinion concluded [23 F.Supp. 117]:

"By that it is, of course, not meant to hold that all rights of the United States to complain of this project are forever barred. If at any time in the future the project should be operated in such manner as to interfere with the navigable capacity of the Kanawha or any other navigable water (a contingency which appears most improbable), the United States will not be barred from asserting its right to protect this navigable capacity by compelling a re-

---

[2] The printed matter submitted for our consideration on this appeal, including briefs, extends over 3642 pages.

moval of the structure or such modification of its operation as is necessary. But I am convinced that the evidence in this case does not disclose grounds for the issuance of an injunction at this time and the prayer for an injunction will be denied and the bill dismissed."

■ As the facts in this case were determined by the court without a jury, we are guided in our consideration of the findings of fact made by the District Judge by Rule 52 of the new federal rules of civil procedure, 28 U.S.C.A. following section 723c, which provides:

"52. In all actions tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of appropriate judgment * * *. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

The new rule has been recently applied here in Guilford Const. Co. v. Biggs, 4 Cir., 102 F.2d 46, 47, where, in an opinion by Judge Parker, it was said:

"The provisions of the new procedural rules that the findings of fact of the trial judge are to be accepted on appeal unless clearly wrong (Rule 52(a), 28 U.S.C.A. following section 723c) is but the formulation of a rule long recognized and applied by courts of equity. Adamson v. Gilliland, 242 U.S. 350, 37 S.Ct. 169, 61 L.Ed. 356; Deutser v. Marlboro Shirt Co., 4 Cir., 81 F.2d 139, 142; Sherman v. Bramham, 4 Cir., 78 F.2d 443; Miller v. Pyrites Co., 4 Cir., 71 F.2d 804; Suburban Imp. Co. v. Scott Lumber Co., 4 Cir., 67 F.2d 335, 90 A.L.R. 330."

This rule seems to have special application in a case such as this where the trial has been exceedingly lengthy, very many witnesses have been heard orally by the district judge, and the subject matter so largely concerns a prominent geographical feature of his own district. Nevertheless in view of the importance of the case, involving as it does conflicting contentions as to state and federal power, and an important policy making Act of Congress, as well as individual property rights, we have felt it particularly necessary to carefully review the evidence in the case on which the findings of the District Judge are based. The States of Virginia and West Virginia have separately filed briefs in this case as *amici curiae* taking the position that the New River both in Virginia and West Virginia does not constitute navigable waters of the United States, and that the Federal Power Commission is without jurisdiction over the river.

■ In considering the effect and weight of the factual evidence regarding the New River, it will be helpful to first state the well established law with respect to rivers and streams, both intrastate and interstate, and whether navigable or not, and the riparian rights thereon respectively. In this case, which so directly involves state and federal rights, it is important to steadily keep in mind our constitutional distribution of power between the state and federal governments. The title to the beds of navigable waters within a state are vested in the State unless under its laws they belong to the riparian owners, (Borax Cons. Ltd. v. Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9; Appleby v. New York, 271 U.S. 364, 46 S.Ct. 569, 70 L.Ed. 992; Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 63, 41 S.Ct. 237, 65 L.Ed. 500; Arkansas v. Tennessee, 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638, L.R.A.1918D, 258; United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746; Pumpelly v. Green Bay & M. Canal Co., 13 Wall. 166, 20 L.Ed. 557), and "the right of the United States in the navigable waters within the several states is limited to the control thereof for purposes of navigation", Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 63, 41 S.Ct. 237, 239, 65 L.Ed. 500; United States v. Oregon, 295 U.S. 1, 14, 55 S.Ct. 610, 79 L.Ed. 1267; James v. Dravo Contracting Co., 302 U.S. 134, 140, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318. The federal government has no property rights in navigable streams or in the waters thereof. Its only power with respect thereto flows from the interstate commerce clause of the Constitution, a necessary incident of which is the power to control and protect navigation on navigable interstate rivers and other bodies of water. Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23. Within the proper scope of the interstate commerce power, the control of navigation by the federal government is plenary; but its sphere of operation is necessarily limited to the protection of commerce which is interstate; the control over purely intrastate rivers and streams, as such, remains with the states, whether the waters are navigable or not; and it necessarily follows even an interstate

stream which is not in fact navigable for purpose of interstate commerce is not subject to the control of the federal government, except to the extent necessary to protect other navigable waters. Federal legislation with respect to navigable waters is permissible only when it has some real and substantial relation to the control of navigation. United States v. River Rouge, Imp. Co., 269 U.S. 411, 419, 46 S.Ct. 144, 70 L.Ed. 339; Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 63, 41 S.Ct. 237, 65 L.Ed. 500; Wisconsin v. Illinois, 278 U.S. 367, 415, 49 S.Ct. 163, 73 L.Ed. 426. For instance, Congress has no authority to construct a hydro-electric dam primarily and only for the development and sale of water power. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 333, 56 S.Ct. 466, 80 L.Ed. 688; Alabama Power Co. v. Gulf Power Co., D.C., 283 F. 606, 613; Little Falls Fibre Co. v. Ford & Son, 249 N.Y. 495, 507, 164 N.E. 558, affirmed 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483.

Where interstate waters are capable of promoting interstate commerce to a substantial degree, they are said to be waters of the United States, a classic definition of which is given in The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999, as follows:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

The rule of this case has not been since departed from, but it has been interpreted and applied in many different factual situations, as a result of which it is now held that an interstate stream is navigable in fact only when it is so *used or susceptible of being used in its natural and ordinary condition* (United States v. Oregon, 295 U. S. 1, 55 S.Ct. 610, 79 L.Ed. 1267; United

States v. Utah, 283 U.S. 64, 76, 51 S.Ct. 438, 75 L.Ed. 844; United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465; Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 86, 43 S.Ct. 60, 67 L.Ed. 140); it must be capable of *valuable* public use in its natural condition (United States v. Cress, 243 U.S. 316, 321, 37 S.Ct. 380, 61 L.Ed. 746); must have a capacity for useful interstate commerce of *a substantial and permanent nature* (Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914), and must have a capacity for *general and common usefulness* for purposes of trade and commerce (United States v. Oregon, 295 U.S. 1, 23, 55 S.Ct. 610, 79 L.Ed. 1267). Only occasional or exceptional use under abnormal conditions is not sufficient (Oklahoma v. Texas, 258 U.S. 574, 591, 42 S.Ct. 406, 66 L.Ed. 771; United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 699, 19 S.Ct. 770, 43 L.Ed. 1136); and, as this court said in United States v. Doughton, 4 Cir., 62 F. 2d 936, 939, quoting from Harrison v. Fite, 8 Cir., 148 F. 781: "*A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable,* is not sufficient."

Is New River at Radford, Virginia, a navigable river of the United States? A very large part of the evidence relates to this issue. Apparently counsel have exhausted the available information, documentary, historical and personal within living recollection. The whole evidence was reviewed and summarized and discussed at length in the opinion of the trial judge who reached the conclusion that the question must be answered in the negative, and our independent examination convinces us that he reached the right conclusion. The evidence is entirely too voluminous to review it in detail, but we will state the outstanding points which have convinced us that the dam is not located in navigable waters of the United States.

*Physical characteristics of the river.* A mere description of the physical and natural characteristics of the river is very persuasive that it is not susceptible of that character of navigation which is necessary, under the decisions above cited, to support the claim that it is navigable water of the United States. It is properly said to be *sui generis,* and is unlike many of the numerous rivers which have been described and held either navigable or non-navigable in Supreme Court decisions which we have

noted.[3] It is characteristically a mountain stream with steep gradient, relatively rapid current, and comparatively narrow stream bed, the river running in many places over limestone and sandstone, rocks and shale, the boulders frequently jutting above the surface of the water, with alternating comparatively still pools of varying length and numerous rapids, falls and shoals in many of which the depth of the water over the rocks is only about one foot, and frequently only a few inches. The following short general description is taken from a report by the Secretary of War to the House of Representatives in 1935 (74th Cong. House Document No. 91):

"Through almost its entire length the river flows through a rugged mountainous country. Its valley is narrow, the flood plain being very little wider than the low-water channel, which varies in width from about 200 to 1,000 feet. In many places the banks are sheer bluffs rising from the river's edge. Ledges of limestone, sandstone, and shale crossing the river at frequent intervals create rapids and waterfalls. The waterfalls vary in height up to about 18 feet. Between the ledges there are usually short pools of varying depth. The low-water depth in the channel varies from a few inches to more than six feet."

Among mountain streams it seems to be unique in the peculiar geologic formation of its rocky bed due to folds and faults in the rock strata, producing ledges running across the stream in many places. In a thirty-five mile stretch of the river in Giles County, Virginia (an important section in this case, as is hereinafter particularly discussed), the geologic environment is "markedly unusual" in that it has been the scene of four predominant breaks or faults; and the slope or gradient of the rocks in the river bed is very unusual in that the incline "is downward in an upstream direction rather than in a downstream direction", with the result that the water falls over the ledges almost vertically. Some of the ledges are upthrust above the surface of the water, and some are barely submerged, and this relative condition varies naturally with the depth of the water in alternate wet and dry periods. The difficulties and dangers of navigation caused thereby, both downstream and upstream, are obvious.[3A]

[3] See The Montello, 20 Wall. 430, 443, 22 L.Ed. 391 (Fox River); United States v. Rio Grande Dam & Irr. Co., 174 U.S. 690, 709, 19 S.Ct. 770, 43 L.Ed. 1136 (Rio Grande River); Leovy v. United States, 177 U.S. 621, 634, 20 S.Ct. 797, 44 L.Ed. 914 (Red Pass); Oklahoma v. Texas, 258 U.S. 574, 591, 42 S.Ct. 406, 66 L.Ed. 771 (Red River); United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (Cumberland & Kentucky Rivers); Economy Light Co. v. United States, 256 U.S. 113, 119, 41 S.Ct. 409, 65 L.Ed. 847 (DesPlaines River); United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (Mud Lake, Minn.); United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (Grand, Green & Colo. Rivers); United States v. Oregon, 295 U.S. 1, 23, 55 S.Ct. 610, 79 L.Ed. 1267 (Malheur & Harney Lakes, Ore.). But some comparison may be made with the Upper Columbia described in Mason Co. v. Tax Comm., 302 U.S. 186, 190, 58 S.Ct. 233, 82 L.Ed. 187.

[3A] The 35-mile section of the river referred to is a part of the 60-mile stretch between Radford, Virginia, the site of the dam in controversy, and the Virginia-West Virginia line. This section of the river is more fully described in the testimony of Prof. A. L. L. Mathews, a professor of geology who has specialized in stratigraphy. "New River is what we geologists call a young stream. That is, it has not yet completely adjusted itself to the geologic environment. It has not yet cut down through its length to such level that it has a low gradient or slope. It is still in the process of cutting down vertically through these rock strata. * * * From the standpoint of the geologist, the geologic environment of New River is markedly unusual. The region has been folded and faulted—that is broken. At one time, millions of years ago, the rock strata now represented in the area were horizontal, but, due to the great earth forces exerted during the geologic ages, the rock strata were folded, twisted and broken. So intensive has this warping and breaking of the rock been, that various rock strata, which normally were at the bottom, so to speak, have been thrust up and over rock strata which ordinarily would lie uppermost. This particular area in New River has been the scene of four predominant breaks or faults. Perhaps the most unusual thing about the geologic condition in the region in point is the concentration of the folding or faulting within the relatively narrow area—that is the distance from Glenlyn upstream to the south limit of Giles County. * * * As is frequently the case with faults, faulting in this area has resulted in the tilting of the rock strata, and, due to the concentration of the fault-

New River rises in northwest North Carolina near the Virginia line and flows generally north-easterly through Virginia for 125 miles. After passing Radford, Virginia, it turns generally northwestward and crosses the Virginia-West Virginia state line at a point about 160 miles below its head (the mouth of Wilson Creek), and then flows north about 25 miles to the City of Hinton in West Virginia, and thence northwesterly about 65 miles to Gauley, West Virginia where it unites with the Gauley River, and the two form the Kanawha River which continues in a northwesterly direction about 95 miles to Point Pleasant, West Virginia, where the Kanawha joins the Ohio River. The total distance from the head of the river at Wilson Creek to the Kanawha River is about 252 miles, and continuing to the Ohio River is 347 miles. Kanawha Falls, a precipitous rapid with a fall of 16 feet, is situated a mile or two below the junction of the New and Gauley Rivers, and the head of navigation on the Kanawha is a few miles below Kanawha Falls. The physical characteristics of the Kanawha are greatly different from New River, having a gradient of only 1.25 feet per mile as compared with the average gradient of the New River of 7.1 feet per mile. The Kanawha is admittedly navigable and has been fully "canalized" by the government which some years ago maintained ten navigation dams thereon, which have now been replaced in whole or in part by four new modern navigation and power dams of concrete construction. The gradient, slope or fall of the bed of New River is not uniform throughout its course but varies from three to four feet per mile to, at places, 31 feet per mile. The elevation above sea level at Wilson Creek is 2240 feet and at Gauley, 651 feet; at the mouth of the Kanawha the elevation is about 500 feet. The stream velocity varies at the shoals and rapids from 3 to 5 miles per hour. The pools of comparatively still water vary in length from a few hundred yards to several miles with a probable average length of less than a mile. The rapids also vary in extent and in the degree of fall. Rapids of 2,000 feet are not uncommon and there are some of much longer extent. The low water depth in the channel varies from a few inches to more than 6 feet. After entering Virginia in Grayson County the river flows through and between spurs of the Blue Ridge Mountains, parallel to the main divides of the Blue Ridge and Alleghanies; and through almost its entire length at places through rugged mountainous country. The most steep, rough and rugged section of the river begins a few miles below Hinton and runs for approximately 45 miles in a narrow tortuous channel between high mountains where the river bed is a mass of sharp ledges and boulders and the water rushes with great velocity.

The average volume of flow of the river at Radford over a period of 28 years ending September 30, 1935, was 3,211 cubic feet per second; the lowest recorded flow there was 521 second-feet on September 6, 1930 during the drought of that year. In the floods of 1878 and 1916 the flow was estimated at about 155,000 second-feet and 146,000 second-feet respectively. At Kanawha Falls, fifty-six year records show an average flow of 13,000 second-feet with a maximum of 270,000 in the flood of 1878 and a minimum of 640 second-feet on August 14, 1930.

*The history of New River* affords no satisfactory evidence of the early use of the river as a highway for trade or travel,[4]

---

ings, the strata are largely tilted to a very steep degree. In many cases they approach the vertical. * * * In its flow, the water of New River moves along and up the slopes of successive rock strata or ledges, and frequently falls over the upper or out-cropping edges of these ledges. In many cases, the falling over of out-cropping edges is practically sheer or perpendicular. * * * In other words, this results in a river with numerous ledges of rock strata, some partly submerged, some exposed, which are substantially vertical or standing on end, and which extend across the stream at right angles to the line of flow, this condition results in a stream with numerous submerged ledges, forming shoals, rapids, and falls. * * *

Generally, the out-croppings of the resistant rock strata extend at right angles across the stream. * * * the prevailing slope is downward in an upstream direction rather than in a downstream direction. * * * In the case of most streams flowing over sloping rock beds, the slope or dip is downward in a down stream direction. Here, however, the reverse is true."

[4] In this respect it is different from the history of the DesPlaines River found navigable in Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847, and the Fox River in The Montello, 20 Wall. 430, 431, 22 L. Ed. 391.

although the valley of the river would have made it a convenient highway through the mountains of Virginia toward the Ohio if the river had been navigable in fact. The river was discovered in 1671 by Col. Abram Woods, and there apparently were settlements in its valley by the middle of the eighteenth century. Early military expeditions toward the west apparently made no use of the river. Several exploratory trips on the river, or parts of it, were made in 1742, 1812, 1817, 1819 and 1828; but the reports thereof do not indicate that there was any navigation on the river. Some early Acts of Virginia and West Virginia have been referred to, relating to proposed opening or improvement of the river, or parts of it, for navigation, but nothing substantial seems to have been done under them. The earliest recorded use of the river for any form of transportation seems to have been during the Civil War when the Confederate Forces had a commissary depot some miles above the Virginia-West Virginia line and some supplies therefor were occasionally taken down the river in bateaux. There were a number of lead and iron mines situated on or near the river just above Radford, and there was coal in West Virginia. About 1872 some persons interested Congress in a plan for improving the New River for use in transportation between the two states. The implication would seem to be that the navigation of the river for this purpose did not then exist. In that year Congress authorized a survey of the New River which resulted in the so-called "mile by mile" survey which is, in our opinion, the most valuable evidence of the natural characteristics of the river.[5] Beginning in 1876 and running through 1882 Congress made various appropriations for work on the river. It was apparently contemplated that improvements should be made from Hinton up the river for 191 miles; but by reason of the very limited appropriation and the experience as to the cost of the work the engineers very soon decided that it would be impossible to create practical and continuous navigation through this entire distance, and they therefore concentrated their work on the stretch-up-stream from Hinton for about 25 miles, and up-stream from Radford for about 30 miles. The work as originally planned was divided into three sections of the river, one known as the lower or Greenbrier Division extending up-stream from Hinton; the Middle or New River Bridge Division, beginning about Radford, Virginia, and extending up-stream to the lead mines in Wythe County, and the third section was known as the Upper or Lead Mines Division, from the lead mines toward the head of the river. No work was done on the Lower and Middle Divisions after 1882 and very little work thereafter was done on the Upper Division. In all about $112,000 was expended under various annual congressional appropriations. In 1891 Col. Craighill, who had been in general charge of the work throughout, reported to the Chief of Engineers of the War Department that the expenditure of a small balance of the appropriation for the work on the Upper Division would be a useless waste of public money. It is said by the plaintiff that this was the most difficult portion to improve. The most reliable evidence in the case in our opinion with regard to the conditions of the river, and the use or absence of use thereof for navigation, is to be found in the annual reports of the District Engineers in charge of the work. The whole is summarized in the report of Gen. Taylor, Chief of Engineers of the War Department, to the Federal Power Commission on December 29, 1925.[6] After correctly stating the substance of the applicable law as to navigable waters of the United States, and expressing the opinion that the natural condition of New River prior to the federal work did not show that it was navigable in fact, he continued:

"It is my opinion that these natural conditions were not changed by subsequent improvements, to the extent of making the river a highway for commerce."

Then after stating the limited amount of work accomplished in the three divisions separately he said:

"Work was limited to the most easily improved places and effort made to so ameliorate conditions as to permit local navigation. The results were not satisfactory or important and Congress discontinued appropriations after 1886, less than one-third of the funds required for any effective improvement having been provided. * * * It is evident that the work executed by the government during the years 1877 to 1882, did not materially

---

5 See Government's Exhibit No. 31; and also the Moore and Briggs survey of 54 miles upstream from the Greenbrier

in West Virginia. Government's Exhibit No. 32.

6 Defendant's Exhibit No. 572.

change the natural non-navigable conditions of the river. The improvement effected was at most slight and fragmentary, and the small channels worked over are reported to have deteriorated due to the natural action of ice and current. Continuous navigation on the river has never been possible, and whatever commerce has existed has been altogether local, apparently confined to the 25-mile section in West Virginia ending at Hinton.

"The District and Division Engineers have reported that there is no commerce and that the river is not now navigable in fact, but they assume that it is legally navigable for the reason that moneys have been expended on it for channel improvement by authority of Congress. It is well settled by judicial decisions that acts of Congress appropriating money for the improvement of a stream are not to be construed as declarations express or implied that the stream is actually navigable. Congress may authorize the improvement of a non-navigable stream with a view to creating navigability, yet unless the improvement is accomplished the natural state of the stream is not changed. Whether or not it is navigable is still a question of fact unaffected by the consideration that money has been appropriated and expended in an effort to improve it."

**Opinions of War Department Engineers.** The opinions of the Chief and District Engineers of the War Department familiar with the conditions on New River are entitled to much weight in this case. It is true that they are only opinions and are by no means conclusive; but they represent especially competent professional opinions on the subject matter with which they were necessarily well acquainted; and their opinions are disinterested. Reference has already been made to many opinions of different engineers touching the matter at different times, both long before the origin of the present case, and during its currency. Thus we have the deliberate opinion of Gen. Taylor in December 1925, after a full review of all the data then available in the War Department upon the subject, and we have his opinion later confirmed in 1930 by the then Chief of Engineers of the War Department, Gen. Brown, and also confirmed by Col. Tyler, Chief Engineer of the Federal Power Commission. Similar opinions have been expressed by District and Division Engineers on other occasions with regard

to the river. It is very significant that the Commission found the report and opinion of Gen. Taylor a sufficient basis for its (first) finding of non-navigability.

**Other evidence on navigability.** It is not disputed that there is no appreciable use of the New River either intrastate or interstate for navigation at the present time, and there has been none for probably at least 25 years in the past. Probably the disappearance of all navigation of the river even locally in the vicinity of Radford and Hinton was partly influenced by the coming of the railroads and the improvement of adjacent roadways. However that may be, at the present time the river is certainly not used and is useless for any substantial or valuable navigation, but by virtue of its physical characteristics is very valuable for water power purposes. A number of power dams have been erected on the river of which there are two a considerable distance above Radford (one about fifty miles) which were constructed without obtaining any authority from the federal government and which have never been interfered with by it. There are also many bridges across the river. The government itself has determined to erect a very large dam and reservoir without locks or other means for navigation, for the combined purpose of flood control and power development, in the river a few miles upstream from Hinton. Condemnation proceedings for this purpose are now pending and the government's position therein has been sustained by this court. United States v. West Virginia Power Co., 4 Cir., 91 F.2d 611. It is also not without significance that the plans and specifications for the Radford dam (without provision for locks) have been approved by the War Department from the standpoint of navigation, and the Federal Power Commission in tendering a license to the defendant company therein recited its finding that the construction of the dam would not be an obstruction to navigation but properly operated would be an improvement thereof. In these circumstances it is apparent that navigation on New River between Radford and Hinton is not a matter of practical moment and the question of navigation is at the most only theoretical. United States v. Doughton, 4 Cir., 62 F.2d 936. It seems to be an entirely logical inference that if the government has heretofore maintained that the river constitutes navigable waters of the United States

between these points, that view must be considered to have been abandoned by it for all practical purposes. We are not unmindful that the Supreme Court in Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847, held that unauthorized artificial obstructions in an otherwise originally navigable river did not destroy its legal navigability; but there the court was dealing with a situation where the DesPlaines River had been in the past one of the principal highways of commerce, trade and travel to the west for more than a century; and the intervention of the government was under different circumstances from those here existing. The question of navigability is one of fact and each case must be determined on its own circumstances. In the present case the actions of the government in the respects just referred to at least are important evidentiary facts bearing on the question whether there is now or ever has been navigability in fact of the New River.

The complaint in this case alleged that New River was navigable throughout its whole course from its source at or near the North Carolina-Virginia line through the states of Virginia and West Virginia; but this extensive claim has now been abandoned and the contention as to navigability is limited to the 115 mile stretch of the river from Allisonia in Virginia (about 30 miles up-stream from Radford) to Hinton in West Virginia. From Radford to the Virginia-West Virginia line the river is about 60 miles in length; and Hinton in West Virginia is 25 miles further down-stream. For the plaintiff to successfully maintain that New River at Radford, Virginia, constitutes navigable waters of the United States, it had the burden of proof to show that the river was a highway for substantial and permanent trade and travel of a generally useful and valuable nature between Radford and Hinton or other points in West Virginia. Upon consideration of voluminous evidence the district judge reached the conclusion that this had not been shown and our independent consideration of the evidence leads us to the same conclusion.

We have not failed to carefully consider the arguments of counsel for the plaintiff in opposition to this conclusion. It is said that the opinion of the district judge (contrary to his findings of fact) shows that the stretches of the river in the somewhat improved sections up-stream from Radford and Hinton respectively were navigable in fact, and it is contended that the physical characteristics of the river in the 60 mile stretch down-stream from Radford to the State line are such that it was susceptible of navigation equally with the improved sections before their improvement. We are not persuaded that this contention on the facts is established. The evidence of the defendant's photographs of places on this section of the river and the mile-by-mile survey above referred to show the serious obstacles to navigation in this stretch of the river consisting of several difficult falls, and many long rapids and shoals. And this stretch includes the 35 miles in Giles County having markedly unusual geologic formation of the rock strata of the river bed above mentioned. It is said there was an ample volume of water, and the gradient or slope of the river was on the average not much steeper than in the sections which were improved, and that the pools were much greater in extent than the rapids. But the obstacles to navigation consisted chiefly in the falls and rapids which were numerous and long; and the slope was not uniform, but very much greater than the average in many places. [6A] No federal

6A The mile-by-mile survey reached Radford coming down stream at about the fortieth mile. Thereafter for illustration some of the more difficult obstacles to navigation shown in the survey in various places reads as follows:

"49th mile. Rapids and shoals (mostly over bowlders) 2000 feet long; fall, 4 feet.

"51st mile. Rapid, over bowlders and gravel, 1500 feet long, fall, 8 feet.

"53rd mile. At lower end Barnitz Falls, over five ledges of limestone 450 feet, over all fall, 6 feet.

"54th mile. Shoal and rapid over bowlders and gravel 800 feet long, fall 4 feet.

"67th mile. Shoals continue for 1,600 feet; then a short pool and Walker's Mount Falls, where the river falls 5 feet in 500 feet, over two ledges of shale and metamorphic limestone.

"68th mile. Continuous ledges of 4,000 feet; fall 8 feet.

"74th mile. Snidow's Falls, 2,000 feet in length; over bowlders and gravel, fall, 5 feet.

"79th mile. Rapid over two ledges, 500 feet long; fall 7 feet; swift water whole mile.

work was done on this 60 mile section of the river between Radford and the State line with the exception of less than a mile ·in Virginia which had no important significance in interstate navigation. As appears from their reports the engineers concentrated their limited available funds on the improvement of conditions around Radford and Hinton where there was access to railroads and where it would therefore be of some value locally. If this stretch of the river was not navigable in fact in its unimproved condition, it is not to be considered navigable merely because it might have been made navigable by improvements which were not in fact made. Of course if the improvements had been made the question of fact might have been different.

Much reliance is also placed by plaintiff's counsel on their contention that despite any obstacles to navigation in the 60 mile stretch between Radford and the state line, there was sufficient testimony of non-expert witnesses with regard to the use of bateaux or keelboats on the river to show that it was navigable in fact even in this critical stretch. It appears from the engineers' reports that there was some use of keelboats on the river as early as 1873; but the extent of their operation before the beginning of the government work in 1878 is not stated, and the annual reports during the government work indicate quite clearly that their use was local in the vicinity of Hinton and Radford respectively; and there is nothing in these reports to show navigation by keelboats between Radford and Hinton. Plaintiff's counsel say that this missing evidence is supplied by a number of aged witnesses testifying from unaided memory as to their knowledge or observation of keelboats in the river fifty to sixty years ago. The district judge discussed at length the extent of the use of keelboats on the river and summarized it as follows:

"It was in these separated stretches of the river that practically all of the bateaux navigation took place and only on them that there was any appreciable trade or commerce by boat. *It is not meant to say*

*that continuous movement of such boats between Hinton and the vicinity of Radford was impossible or did not occur.* There is evidence which indicates that it did occur, but there is a vagueness about the extent to which it occurred and indications that *such trips were irregular, were attended with difficulty, and formed no appreciable part of any commercial transportation which took place on the river.* The most definite evidence of the extent of navigation on the river are the reports of the government engineers both before and after beginning improvement of the river in 1877, and these reports repeatedly state that the commercial navigation was local to separated stretches of the stream and that there was no continuous navigation." (Italics supplied.)

It is said that this conclusion did not correctly appraise the effect of the oral non-expert testimony; and in plaintiff's reply brief there are listed the names of 23 such witnesses from whose testimony it is contended the contrary conclusion should have been reached. We have carefully considered this testimony, but are not convinced that it was given too little weight. This is the type of testimony that the trial judge who sees and hears the witnesses is particularly well qualified to appraise. These witnesses were for the most part elderly men who were testifying purely from unaided memory of events long past. Such testimony has inherent infirmities and is obviously not entitled to the weight to be properly given to contemporary official written records. United States v. Oregon, 295 U.S. 1, 19, 55 S.Ct. 610, 79 L.Ed. 1267. It also had to be appraised in connection with similar testimony of almost an equal number of witnesses introduced by the defendant by which it was to a considerable extent contradicted or qualified; and proper consideration also had to be given to the other testimony in the case, verbal and documentary, of expert and scientific witnesses tending very strongly to show that the river was nonnavigable in fact. But even if the recollection testimony of the witnesses on both

---

· "92nd mile. Peter's Mountain Falls, where river falls 4½ feet in 1,300 feet, over a succession of limestone ledges, terminating in an abrupt fall of 5 feet.

"100th mile. Neilley's Falls and rapids; whole fall 11 feet, 6 of it nearly vertical. A sluice 500 feet long, along left bank, will pass them, with 50 feet of

rock excavation and 450 feet of bowlders and gravel.

"104th mile. Commences with shallow riffle, 600 feet long, over bowlders and gravel, and following this occurs Wiley's Falls where the river falls 4 feet in 10 feet, over a limestone ledge about 50 feet wide."

sides is viewed as a whole apart from the other evidence, we do not think that it showed interstate navigability of the river within the requirements of the judicial decisions above mentioned. Very few of these 23 witnesses for the plaintiff (about four or five) testified to any personal experience in keelboat trips on the river between Radford and Hinton (and from parallel testimony by defendant's witnesses several of these were not ordinary commercial trips for trade or travel); more (six or seven) related recollection of their use between Hinton and Glenlyn (the latter in Virginia about 5 miles from the state line); and the others stated that they had seen or used keelboats on one or more occasions at various points on the river within the 60 mile stretch, and some of them had hearsay information that some of the boats went as far down stream as Hinton. Viewed as a whole, the testimony seems to us to establish nothing more than that there were some trips of keelboats between Radford and Hinton; that such trips could be made only at particular times when there was unusually high water; that even then navigation was not only difficult but also dangerous; that while the boats at times may have carried some country produce there was nothing like an established trade and commerce between Radford and points in West Virginia; and that the duration of such use of the keelboats was for a few years only and has been non-existent for more than 50 years. Very possibly this entire disappearance of any keelboats on the river was influenced somewhat by the coming of the railroads to Glenlyn in 1883 and to Allisonia in 1886; (there were railheads at Hinton in 1873, and at Radford some years earlier); but there was also testimony of non-expert witnesses submitted by the defendant to the effect that the attempt to commercially use keelboats was unsuccessful and unprofitable, and in the Radford-Allisonia district was substantially abandoned before the railroad came to Allisonia in 1886. We conclude that the summary of the testimony on this point above quoted from the opinion of the district judge is a fair appraisal of the evidence; and that the plaintiff has not shown that there was interstate navigation on New River of such a substantial and permanent nature, and of such general and common usefulness, that it would subject the river to federal servitude for the benefit of navigation.

■ We have also considered the weight to be properly given to the fact of the government work. In many cases such evidence may be a factor of great importance in favor of navigability; but in this case we do not think it conclusive or even very important, in view of its limited nature and abandonment. It was referred to in the reports as "experimental" and was finally abandoned as a further waste of money, on the Upper Division. It did not, according to the reports, essentially change the original non-navigable condition, and was limited to a few local stretches. In the circumstances it cannot properly be regarded as establishing navigability. Oklahoma v. Texas, 258 U.S. 574, 590, 42 S.Ct. 406, 66 L.Ed. 771.

■ *Will the maintenance and operation of the dam obstruct the navigable capacity of any down stream navigable waters of the United States?* Here again the testimony bearing on this issue is voluminous consisting largely of scientific and expert opinion. It also has been reviewed at length in the opinion of the district judge who concluded that the operation of the dam in any normal, usual and reasonable way would not substantially affect the down-stream navigability of the Kanawha or Ohio Rivers; and in our opinion the weight of the evidence bearing on this issue clearly supports the finding made. Of course the mere construction of the dam apart from its operation could have at the best only very temporary effect on the downstream flow of water pending the filling of the storage reservoir behind the dam. It is not the plaintiff's contention that the dam must necessarily be operated in such a way as to prejudice down stream navigability, because it is conceded in the briefs that the proper operation of the dam in accordance with the conditions of the proposed license and the rules and regulations of the Commission and the War Department would even be of benefit to navigation. The contention is that the size and capacity of the dam, in relation to the average volume of flow of the stream, is such that the only reasonable inference is that the dam will be operated in a way to impair down-stream navigability. It is pointed out that the plans for the dam provide for a draw down area of 27 feet with hydro-electric machinery of 104,000 h. p., and a capacity for water consumption of 9,000 cubic feet per second; and that the average annual flow

of the New River at the point of the dam is only a little more than 3,000 cubic feet per second. The capacity of the reservoir or storage pool for water behind the dam is said to be 100,000 acre-feet. It is also pointed out that this hydro-electric dam is only one link in a large electric light and power generation and distribution system of the Appalachian Company whose public service extends interstate over a distance of 100 miles or more. From these facts it is argued that the cost of the dam could be economically justified only on the assumption that it would function in the whole system to furnish power at that time of the day and week when the power demand upon the Appalachian system is at its peak, or, as it is expressed, the dam will be operated on a "peak" basis; and it is further said that this means operation in which during about eight hours of the day five days a week the power machinery will be used to its full capacity of 9,000 cubic feet per second and will discharge that amount into the river below the dam, while during the remaining hours of the day for five days a week, and probably all of Saturday and Sunday, there will be no operation of the dam for the generation of electricity, and no discharge of water into the river below the dam. The ultimate deductions made in the argument are that in the low water seasons the consumption and discharge of water will be cut off entirely until the reservoir is filled, thus depriving the Kanawha and Ohio Rivers of a material part of their water supply from New River; and when the dam is operated the alternate shutting down of the plant with no discharge of water and the release of water during the hours of operation at the rate of 9,000 cubic feet per second will cause "power waves" which will have an adverse effect upon navigation in the Kanawha by causing there fluctuations or oscillations in the stream.

The defendant denies the reasonableness of these assumptions as to the method of operation of the power dam, and very definitely says that it has no intention to so operate it, and that the assumed method would be abnormal and impracticable. It explains that the large maximum capacity for the use of 9,000 cubic feet per second flow is not designed to be used currently, but only as a potential reserve for temporary emergencies. The defendant realizes that by customary day by day operations it cannot use more than the average amount of the water flow, simply because the water will not be there to use; and therefore it must proportion its actual operations to the stream flow, occasionally drawing on the reservoir for the continuance of customary and usual operation, when the water flow in dry periods is abnormally low. The defendant does not deny that in its intended customary daily operation there will be a variable amount of water discharged from the dam, but it does deny that there will be such great variations as are assumed by the plaintiff; and it denies that the variable amount will have any adverse effect on down stream navigability. The defendant's stated position is that it fully realizes that it has no property right in the water as such, and is only entitled to a reasonable use thereof as riparian owner, which must be limited in such way that the rights of other riparian owners on the stream below and above will not be prejudiced. It points out that it will have a very large monetary investment in its project and that it would be economically very unwise and indeed foolish to operate its plant in such a way that the rights of others would be impaired and the defendant subjected to damages therefor; or to operate the plant so that it would be subject to a successful injunction suit for impairment of navigable capacity of down stream waters.

There is no reason to doubt the good faith of the defendant in its position so stated because it expressed its willingness to accept the minor-part license from the Commission containing, among other things, the condition that it as licensee should be liable for all damages occasioned by the operation of the project; and the condition that "whenever the flow at lock No. 2, Kanawha River, falls below 1400 second feet, the Licensee shall when so directed by the Secretary of War discharge in each 24 hours the natural flow of the river at the dam site during that period up to a discharge of 1150 acre feet. The discharge from the project shall at all times be regulated by such rules and regulations as the Secretary of War may prescribe to prevent undue interference with navigation on the Kanawha River."

The evidence of expert witnesses offered by the plaintiff on this issue was largely based on their assumptions as to the defendant's probable operation of the dam.

The contentions in substance are that for considerable periods of time there would be no discharge of water from the dam in consequence of which the volume of water flow in the Kanawha and Ohio Rivers would be seriously diminished; and the discharge of water from the dam when made would be in such large quantities as to form *block waves* of 9,000 cubic feet per second which would cause much increased velocity of current in the Kanawha and fluctuations and oscillations of the .water level which would impair its navigability. These contentions are refuted in the testimony of a number of witnesses for the defendant who were competent and experienced engineers in the construction and operation of hydro-electric plants. In this connection it is to be noted that the distance on the river from the Radford Dam to the head of navigation in the Kanawha is approximately 160 miles on a tortuous river course interspersed with numerous. rugged ledges; and there is a recently constructed power dam at Hawks Nest on the New River a few miles upstream from the Kanawha[8] which would naturally absorb any "power waves" from the Radford plant that remained after their 150 mile journey from Radford. In addition the government has recently constructed three large navigation and power dams on the Kanawha River known as the London, Marmet & Winfield Dams, with another now under construction at Gallipolis, Ohio, equipped with locks for navigation, as a result of which the Kanawha River is fully "canalized", that is, consists of a series of pools between the dams affording approximately uniform depth of water for navigation. These dams also have large power capacity and are operated under lease from the government by private interests. They' directly discharge water consumed by power operations into the respective pools. There is also evidence to the effect that there is an abundant supply of water from tributaries of the New River and Kanawha River below Radford to supply any loss or waste of water in the pools of the Kanawha caused by the operation of the locks or otherwise. The purpose of the navigation dams on the Kanawha is to maintain an approximately uniform level of water. In these circumstances the district judge found that it was highly improbable that any operation of the Radford Dam would or could impair the navigability of the Kanawha and Ohio Rivers.

There is still another factor to be considered in this connection, relating to the government's project for the Bluestone Dam in the New River without locks, approximately 150 feet high. The dead storage will rise about 66 feet, with 49 additional feet of usable draft water, leaving 35 feet to be reserved for freshets and flood control. The storage capacity is to be 245,000 acre-feet, about two and one-half times greater than the. Radford Dam (85 miles up-stream), and the Bluestone Dam is to have a maximum hydraulic capacity of about 11,000 cubic feet per second. The primary purpose of this dam is for flood control with incidental power production. It seems quite evident that this Bluestone flood control project will remove any possibility of any impairment of navigable capacity of the Kanawha from the operation of the Radford Dam if the latter were otherwise possible.

It will also be recalled that in his report of December 29, 1925 to the Power Commission, Gen. Taylor, then Chief Engineer of the War Department, after reviewing the data upon the subject, said:

"Therefore, so far as can be predicted from available data and records it would not be possible to operate the proposed project so as to adversely affect navigation on the Kanawha River under the existing project.

"I, therefore, report that in my opinion New River in its present condition is not a navigable stream and that navigation on the Kanawha River will not be adversely affected by the proposed power development."

The Commission apparently rejected Gen. Taylor's opinion as to the effect on the Kanawha River, although it does not clearly appear what other evidence it had before it on the subject, except possibly the report as to the effect of waves from power dams on certain California rivers (which was determined to be inadmissible in the district court for lack of proof as to similarity of conditions).

On this and other evidence too detailed to elaborate here, the district judge found that there would be no reasonable likelihood of adverse effect on the navigability of the Kanawha or other navigable waters of the United States; and we find

---

[8] See United States v. West Virginia, 295 U.S. 463, 55 S.Ct. 789, 79 L.Ed. 1546.

no sufficient reason in the case to conclude that he was wrong in this finding. On this issue the plaintiff had the burden of proof to establish its contention that the operation of the Radford Dam would affect the navigable capacity of down-stream navigable waters. The leading case on this point is United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 777, 43 L.Ed. 1136. The suit there was to enjoin the defendant company from constructing a dam across the Rio Grande River in New Mexico at a point where the river was not navigable, but it was alleged the maintenance of the dam would impair the capacity of the down-stream river where it was navigable. The government's case was based on section 10 of the Rivers and Harbors Act of September 19, 1890, 26 Stat. 454, (later somewhat amended by the 1899 Act on which this present suit is based). The Supreme Court said:

"Of course, when such proceedings are instituted, it becomes a question of fact whether the act sought to be enjoined is one which fairly and directly tends to obstruct (that is, interfere with or diminish) the navigable capacity of a stream. It does not follow that the courts would be justified in sustaining any proceeding by the Attorney General to restrain any appropriation of the upper waters of a navigable stream. The question always is one of fact, whether such appropriation substantially interferes with the navigable capacity within the limits where navigation is a recognized fact."

The plaintiff was not entitled to the injunction in this case unless it established an existing or presently threatened impairment of navigable capacity of the Kanawha; and where the defendant in such a case evidently in good faith denies any intention to commit an injury, the plaintiff must show that the injury sought to be avoided by the injunction will be necessarily or practically certain, and not merely the probable, result of the acts whether intended or not. Connecticut v. Massachusetts, 282 U.S. 660, 674, 51 S.Ct. 286, 75 L.Ed. 602; State of Missouri v. State of Illinois, 180 U.S. 208, 248, 21 S.Ct. 331, 45 L.Ed. 497; Blease v. Transit Co., 4 Cir., 50 F.2d 852, 856; Meyer v. Somerville Water Co., 82 N.J.Eq. 572, 89 A. 545; Pennsylvania Co. v. Sun Co., 290 Pa. 404, 413, 138 A. 909, 55 A.L.R. 873.

The plaintiff also contends that even if there would be no impairment of the navigable capacity of the Kanawha, nevertheless it is entitled to the injunction because there will be an impairment of interstate navigation between Glenlyn on the New River in Virginia, and Hinton in West Virginia. We are not impressed by this contention. Glenlyn is about five miles upstream from the Virginia-West Virginia line. In 1912 it had a population of only 500. The railroad along the river reached Glenlyn in 1883. There is no present navigation of the river between Glenlyn and Hinton and there has been none for probably 25 years. It is said that there was considerable keelboat navigation of the river between Glenlyn and Hinton in previous years; but we are disposed to believe from the evidence that this is an overstatement. There are serious obstacles to navigation on the river between Glenlyn and the state line, including Shumate's Falls and Wylie's Falls at or near the state line. Probably any substantial transportation on the river in earlier times was from Round Bottom, below these difficult rapids, to Hinton. The federal improvement work never reached up-stream to Glenlyn but stopped four or five miles below it. A light draft steamer built at Hinton was unable to get upstream more than about 15 miles. In 1930 the District Engineer of the War Department reported that the New River was not navigable at Glenlyn. In these circumstances, it would not be justifiable to issue an injunction to restrain an obstruction to the purely theoretical navigation of New River between Glenlyn and Hinton, especially where there is no satisfactory proof that the operation of the defendant's dam will in fact impair even possibly existing present capacity for navigation, and where there is no likelihood of future navigable use of the river. Of course if the defendant's dam is so operated in the future as to impair navigation, if any at that point, it may well be proper then for the courts to intervene. It is also again significant here that the government's Bluestone Dam will destroy any possibility of navigation from Glenlyn to Hinton.

There is also a contention by the plaintiff that the Radford Dam may in some way impair the efficiency of the Bluestone Dam for flood control, and thus operate prejudicially on navigation of the lower river. The district judge considered and rejected this contention as based on insufficient evidence, and we find no good reason to reach a contrary conclusion. It would seem the Radford Dam would be a help

rather than a hindrance in this respect; and if not an injunction may later be appropriate.

*The effect of the Federal Power Act on the case.* While nearly all of the evidence related to the two issues above discussed, the major part of the legal argument in this case has revolved around the proper construction and application of the Federal Water Power Act of 1920, and as amended in 1935, 16 U.S.C.A. § 791 et seq. It is contended by general and special counsel for the Power Commission that even if New River at Radford is not navigable waters of the United States, and the operation of the dam will have no adverse effect on the navigable capacity of down-stream waters, nevertheless the defendant must be enjoined from constructing the dam because it has not obtained a license from the Power Commission. It is argued that the Power Act is an exercise by Congress of a much wider jurisdiction over streams than was asserted by the Rivers and Harbors Acts of 1890, 26 Stat. 426, and 1899, 33 U.S.C.A. § 401 et seq.; and that in the Power Act Congress has given the Commission jurisdiction to prevent, except by its license granted on the conditions specified by the Commission, the erection of any bridge, dam or other structure on rivers and streams, whether navigable or not, where the interests of interstate commerce are concerned, *whether they relate to navigation or not.* In connection with this view it is said in the briefs "Thus the primary purpose of the legislation was the control of water power development, not of navigation". This argument is based upon the language of section 23 of the Act of 1920. But before examining this contention we notice two preliminary points based on the Act.

In the first place, it is argued that in this proceeding the findings of the Commission with respect to navigability and the effect of the dam on navigability, and on interstate commerce, are conclusive if supported by substantial evidence, which is asserted to be the case here. It is not disputed that the case can be judicially considered *de novo,* but it is said that the ordinary rule that findings of an administrative tribunal must be accepted, if supported by substantial evidence, must control the decision here on the facts. In our view this contention is not applicable to the present case. Section 23 does not provide for a "hearing" by the Commission when a declaration of intention to build a dam is filed, but only for an "investigation" by the Commission. Nor does the Act provide for any judicial review of the findings made. Nor is this case a statutory proceeding by way of appeal from or review of the Commission's action. Assuming that the finding of the Commission is a relevant fact for the consideration of the court, and that it is entitled to careful and respectful consideration as the opinion of a body informed by experience, nevertheless it cannot properly be regarded as controlling judicial determination on the record in the case. Clearly the decision of the district court involved a constitutional question of the jurisdiction of the Commission in relation to the distribution of state and federal power, and of riparian property rights of the defendant. This, we understand, is not disputed so far as the action of the district court was invoked under the Rivers and Harbors Act; and it seems equally clear that the same must be true with respect to any jurisdiction of the Commission in this case. In that view it is clear that the district judge was required to determine the question of fact *de novo* on the record made at the trial before him. Crowell v. Benson, 285 U.S. 22, 58, 59, 52 S.Ct. 285, 76 L.Ed. 598; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 51, 56 S.Ct. 720, 80 L. Ed. 1033; Baltimore O. R. Co. v. United States, 298 U.S. 349, 364, 56 S.Ct. 797, 80 L.Ed. 1209.

It is also suggested that the defendant is estopped to question the findings of the Commission because it submitted itself to the action of the Commission in requesting a finding that the Commission was without jurisdiction and in applying for a minor-part license; but we do not think this view is tenable as the United States has in no way been prejudiced thereby, and the defendant throughout has clearly enough stated its legal position to the effect that the Commission did not have jurisdiction. There can be no proper waiver of constitutional rights in such a situation; nor do we think it was the intention of Congress that there should be; Buck v. Kuykendall, 267 U.S. 307, 316, 317, 45 S.Ct. 324, 69 L.Ed. 623, 38 A.L.R. 286; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688; nor do we think that Standard Oil Co. v. United States, 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999 (cited

792

by the plaintiff), relating to the election of remedies under the Interstate Commerce Act by a shipper, is applicable here.

■■■ If the public hearing granted by the Commission in 1926 and above referred to is to be regarded as a hearing in the sense of due process, and therefore the defendant is to be affected by the finding of the Commission that the interests of interstate commerce would be affected by the dam, we could hardly conclude that the finding was based on substantial evidence, in view of the fact that the only evidence then introduced was the report and opinion of Gen. Taylor to the contrary. At the hearing counsel for the defendant inquired whether further or other evidence was to be considered by the Commission and if so, indicated his desire to be informed of it. Nothing was then said to indicate that the Commission desired or would consider other evidence. It is now said by counsel for the Commission that it did have available, and must have considered, other information upon the subject to be found in various official reports, public documents, and Acts of Congress, many of which were offered in evidence by the plaintiff in this case. 9 But as these matters were not brought to the attention of the Company at the hearing, it is not perceived how they could be regarded as evidence affecting it in the sense of due process. Interstate Commerce Commission v. Louisville & Nashville Railroad Co., 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431; Morgan v. United States, 304 U.S. 1, 14, 15, 19, 58 S.Ct. 773, 999, 82 L.Ed. 1129. For the same reasons we do not think that the subsequent declaration or finding of the Commission on October 12, 1932, can be regarded as in any way affecting the rights of the defendant, because it was made ex parte without notice or hearing. It is not meant to suggest that the Commission at any time intentionally proceeded arbitrarily, or without proper regard to the rights of the Dam Company, or that its proceeding was inappropriate to the "investigation" directed by the Act; but only that its finding, to the extent based on information obtained informally and ex parte, and not brought out at the notified hearing where it would be subject to cross-examination and possible refutation, cannot properly be considered as consistent with due process, if sought to be made conclusive on the defendant. The reasonable assumption would seem to be that the procedure followed was adopted as appropriate to an "investigation" by the Commission, rather than a "hearing" with the legal implications thereof. See Norwegian Nitrogen Products Company v. United States, 288 U.S. 294, 317, 53 S.Ct. 350, 77 L.Ed. 796.

Attention is called to the definition of navigable waters contained in section 3, 16 U.S.C. § 796, 16 U.S.C.A. § 796, of the Water Power Act. 10 It is apparently not contended that the definition expands the scope of the term beyond the previous judicial decisions applying it under the Rivers and Harbors Act and in other cases (Alabama Power Co. v. Gulf Power Co., D.C., 283 F. 606, 614); but it is said that the statutory definition has crystallized the judicial definition on three points, of which one is said to be particularly applicable here— that is, that navigability should be determined in reference to the stream in its actual condition, whether "natural or improved". The observation is then made that the district judge in his opinion apparently implied that the federal improvements on New River were not to be considered in determining its navigability. But we do not understand the opinion to proceed on that basis.

■■ We come now to the Commission's present construction of section 23 of the Water Power Act of 1920, 16 U.S.C.A. § 817, which reads:

9 It is also pointed out that the Commission had 21 affidavits filed by the Dam Company tending to support non-navigability; and certain protests filed by individuals. These do not seem to affect the matter.

10 " 'Navigable waters' means those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which either in their natural or improved condition, notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids; together with such other parts of streams as shall have been authorized by Congress for improvement by the United States or shall have been recommended to Congress for such improvement after investigation under its authority;."

"*Projects not affecting navigable waters; necessity for Federal license.* Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, *and over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States,* may in their discretion file declaration of such intention with the commission, whereupon the commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not proceed with such construction until it shall have applied for and shall have received a license under the provisions of this chapter. If the commission shall not so find, and if no public lands or reservations are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws."

We have italicized the clause on which the construction is based. The view contended for is that this clause, as a part of the whole section, gives the Commission jurisdiction over dams proposed to be constructed on *non-navigable waters,* irrespective of the effect of the dam on navigable waters of the United States, whenever the Commission finds after investigation that "the interests of interstate or foreign commerce would be affected by such proposed construction;" that is to say, if the dam is to be constructed in a stream not a navigable water of the United States and will have no effect on navigation, nevertheless it may not be constructed without a license from the Commission if it will affect interstate commerce in some other way not related to navigation. Specific application of this construction is given to the instant case in the contention that although New River at Radford is found to be not navigable waters of the United States and the dam will not affect down-stream navigable capacity, nevertheless the Radford Dam may not be constructed without a license from the Com-

mission because (1) the river at or above Radford has years heretofore been used for keelboat transportation of goods for delivery to the railroad at Radford for carriage in interstate commerce and might possibly be similarly used hereafter, and (2) the dam is intended to transmit electric power outside of Virginia. The construction flows from the general view of the purpose of the Act expressed by counsel for the Commission in their brief when they say: "Thus the primary purpose of the legislation was the control of water power development, not of navigation". We do not think this broad construction of the Act based on the interstate commerce power, to the extent that it is dissociated from navigation, is tenable either on the basis of statutory construction or constitutional authority. Alabama Power Co. v. Gulf Power Co., D.C., 283 F. 606, 613.

*As a matter of statutory construction.* It will be noted that the section leaves it *optional* with the proponent of the project to apply to the Commission for a determination. On the plaintiff's construction we have therefore the following possible divergent results dependent upon whether the option is exercised or not. Where the option is not exercised and the Commission is not consulted (and therefore makes no finding as to interstate commerce) the remedy of the United States is to bring an injunction proceeding to abate the dam, in which event it will be necessary for the government to show either that the river is navigable water of the United States or the dam would affect navigable capacity. But in the event the project owner elects to consult the Commission upon the subject and it finds that interstate commerce would be affected in some way not related to navigation, then the government could successfully maintain the injunction suit on the basis of the Commission's finding alone without proof of the effect of the project on navigation.

 But apart from this, a reading of the Water Power Act of 1920 as a whole indicates that it was intended to assert control (where federal property was not concerned) only where the interests of navigation, as an incident of interstate commerce, were affected.[10A] See New

<hr>

10A The title to the Act reads "An act to create a Federal Power Commission; to provide for the improvement of navigation; the development of water power; the use of the public lands in rela-

tion thereto, and to repeal section 18 of the River and Harbor Appropriation Act, approved August 8, 1917, and for other purposes." Section 18 of the Act of 1917, Ch. 49, 40 Stat. 269, repealed by the

Jersey v. Sargent, 269 U.S. 328, 336, 46 S.Ct. 122, 70 L.Ed. 289. Prior to the Water Power Act we are not aware of a successful assertion of authority by Congress **over** non-navigable waters within a state, (not involving public property of the United States) except where the interests of interstate commerce flowing from navigation were concerned. This was the extent of authority indicated in the Rio Grande case, supra.[10B] Over navigable waters of the United States Congress directly has jurisdiction to prevent obstructions to navigation; but over non-navigable waters within a state, where the riparian rights are not owned by the government itself, the only authority or jurisdiction of Congress flows from the interstate commerce power which, with respect to rivers and streams *as such,* is limited to the protection of navigation of other streams. Beyond this federal control over non-navigable streams is the same as, but no greater than, over state highways on land not usable in interstate transportation.

Section 4(d) of the 1920 Act, 16 U.S.C.A. § 797 (d), authorized the Commission to issue licenses for the purpose of constructing, operating and maintaining dams, etc.,

"necessary or convenient for the *development and improvement of navigation,* and for the development, transmission, and utilization of power across, along, from or in any of the navigable waters of the United States, or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided: * * * Provided, further, That no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structures affecting the *navigation* have been approved by the Chief of Engineers and the Secretary of War. Whenever the contemplated improvement is, in the judgment of the commission, desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, a finding to that effect shall be made by the commission and shall become a part of the records of the Commission." (Italics supplied).[10C]

Section 11, 16 U.S.C.A. § 804, provides for the inclusion of conditions to *promote navigation* where the dam is constructed "in any of the navigable waters of the United States." Section 18, 16 U.S.C.A. § 811, provides for the operation of navigation facilities constructed in connection with licensed dams. Apart from section 23 the provisions of the Act, relating to the authority over the construction of power dams, seems to be clearly based on the interstate commerce power with respect to navigation. Section 23 was added as amendment 58 in the course of a long legislative history; and its wording and punctuation may be lacking in entire clarity, but it seems quite unlikely that in this merely permissive amendment it was the intention of Congress to confer on the Commission jurisdiction over streams in matters affecting interstate commerce but not related to navigation, especially as Congress had not previously asserted such a power.

▇▇▇▇ It is contended that the 1935 amendment to section 23 supports the construction contended for. The only change in the comparable part of the section was to make the filing of the declaration obligatory instead of optional. The wording of the clause on which the construction contended for is based was not changed.

---

Water Power Act had created the Water Ways Commission to formulate plans to develop water resources for navigation, etc. and, among other things, to investigate "questions relating to the development, improvement, regulation, and *control of navigation as a part of interstate and foreign commerce,* including therein", etc. (Italics supplied.)

[10B] It may be noted that that case arose under section 10 of the Rivers and Harbors Act of 1890, 26 Stat. 454, which prohibits "the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of *any waters, in*

*respect of which the United States has jurisdiction."* In the 1899 Act the wording was slightly changed to read "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the *waters of the United States* is hereby prohibited."* 33 U.S.C.A. § 403. (Italics supplied.)

[10C] Some of the wording was changed by the 1935 amendment, and the section became 4(e) of the new Act. See 49 Stat. 840, 16 U.S.C. § 797(e), 16 U.S.C.A. § 797(e).

We do not attach the significance to the amendment that is claimed for it. Nor do we think it should be given a retroactive effect. It was passed after the institution of this suit and more than a year after the beginning of the construction of the dam.

■ The construction now put upon section 23 by counsel for the Commission seems to be much broader than that advanced in the district court. There it seems to have been limited to the contention that the Commission had jurisdiction over non-navigable streams only where the proposed structure would affect the navigable capacity of the river down-stream, that is in this case the Kanawha. After extended consideration the district judge reached the conclusion that the effect of the section was only to provide a convenient method of determining, in advance of the construction of the dam, the status of a stream of doubtful navigability; and that the Commission had no jurisdiction over non-navigable streams. The opinion referred at some length to the legislative history of the section when offered as amendment 58, and also to early expressions of the Commission shortly after its first organization, in support of that view. We take a partly different view of the effect of the section with respect to non-navigable streams.

■ The wording of section 23 which requires application, rather than construction, is "any stream * * * over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States". It is clear that the Commission is given authority by this section only over a stream "over which Congress has jurisdiction" under the interstate commerce power. We think this modifying clause has no uncertainty of meaning in view of the legal history of the subject matter. Over what streams does Congress have jurisdiction by virtue of the interstate commerce power? Ever since Gibbons v. Ogden, supra, and The Daniel Ball, supra, it has been clearly understood that Congress does have such jurisdiction over interstate navigable waters; and by section 10 of the Rivers and Harbors Act of 1890, 26 Stat. 454, this jurisdiction was logically and properly extended to non-navigable rivers which were tributaries of navigable interstate rivers to the extent that "the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of *any waters, in respect of which the United States has jurisdiction*" is prohibited. In the 1899 Act, 30 Stat. 1151, 33 U.S.C.A. § 403, on the same subject the wording of the underscored phrase was slightly changed to read "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of *any of the waters of the United States* is hereby prohibited". (Italics supplied). Section 9 of the Rivers and Harbors Act of 1899, 33 U.S.C.A. § 401, also provided that dams and certain other structures should not be constructed in any "navigable river, or other navigable water of the United States" until the consent of Congress has been obtained and the plans approved by the Chief of Engineers and by the Secretary of War. It will thus be noted that prior to the Water Power Act of 1920 Congress had asserted jurisdiction over interstate navigable waters, and also over streams tributary thereto, to the extent mentioned, by prohibiting any structures in interstate navigable waters and in non-navigable tributaries, if the latter affected navigable capacity of interstate navigable waters, unless the consent of Congress was first obtained. One of the purposes of the Water Power Act was to authorize the Commission to license dams in navigable waters of the United States in lieu of an Act of Congress; and in our opinion one of the purposes of section 23, which was an amendment to the original Act, was to likewise take care of the case of a proposed structure in a non-navigable tributary of an interstate navigable stream. Before the Water Power Act it was not safe to construct a dam in a non-navigable stream, where there was any doubt whether navigable capacity of down-stream waters might be affected, without an Act of Congress; and section 23 was added to the Act to provide a convenient administrative procedure to determine this doubt from the standpoint of the government, so that the project owner would know the position of the government in the matter. If the Commission found that interstate commerce would not be affected in the respect mentioned, then the project owner was permitted by the section to proceed without a license; but if the Commission found otherwise, then the stated position of the government was that he could not proceed without a license and if he did so it was at the risk of being enjoined. But as the authority of the government

to forbid the structure was necessarily dependent upon the fact that it would impair navigation, the government could succeed in the suit only on proof of that fact *de novo*, as it is a jurisdictional requisite to the power to control the use of private property without compensation.

In their briefs counsel for the Commission have now called to our attention certain earlier legislative history of the Act in support of their contention that the proper construction of· section 23 was to give the Commission full jurisdiction with respect to both navigable and non-navigable streams wherever *any* interests of interstate commerce would be affected; but we are not persuaded that this earlier history tends to support that view. The Water Power Act had a long and interesting legislative history in the course of which many amendments were proposed which reflected diverse views upon the subject, and we do not think it would be a safe basis for interpretation of the final form of section 23 to impress upon it argumentative inferences from numerous former amendments.

The broad construction of the section now contended for runs counter to established legal principles. Where the interests of navigation are not involved (and where the United States does not itself possess property rights) the control of the use of the flowing water and the rights therein of riparian owners are subject to the laws of the several states. In this case under the laws of Virginia the defendant Company has the full riparian rights of ownership including the right to the reasonable use of the waters flowing past its land for the development of power, and has a license from the State of Virginia to construct and operate the dam under its general Act for the development of water power resources of the State. If the river were federally navigable the rights of the riparian owners would of course be fully subject to the federal servitude in the interests of navigation; but the riparian owner on a non-navigable stream is entitled to reasonable use of the flowing waters (not impairing downstream navigable capacity) subject to no easement in favor of navigation; and this is a property right which cannot be taken from him without just compensation. United States v. Cress, 243 U. S. 316, 37 S.Ct. 380, 61 L.Ed. 746; Carpenter v. Gold, 88 Va. 551, 14 S.E. 329; United States v. River Rouge Imp. Co.,

269 U.S. 411, 418, 46 S.Ct. 144, 70 L.Ed. 339; Lynchburg v. Mitchell, 114 Va. 229, 76 S.E. 286; Holyoke Water-Power Co. v. Lyman, 15 Wall. 500, 505, 506, 21 L. Ed. 133. The power of Congress over interstate commerce is, of course, plenary, and private property may be taken for a public use in connection therewith; but only subject to the just compensation provided for in the 5th Amendment, U.S.C. A.; and to prohibit the defendant company from the exercise of its riparian rights in the case, where no interests of navigation are involved, would seem to be a taking of private property without due process required by that Amendment. While Congress may impair the effectiveness of executory contracts which interfere with the exercise of the interstate commerce power, we are not aware of any authority which would justify the taking of private property without just compensation as an exercise of the regulation of commerce. Federal Radio Comm. v. Nelson Bros. Bond & Mortg. Co., 289 U.S. 266, 282, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406; Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 558, 57 S.Ct. 592, 81 L.Ed. 789; Interstate Commerce Commission v. Oregon-Washington R. & Nav. Co., 288 U.S. 14, 15, 41, 53 S.Ct. 266, 77 L.Ed. 588; Monongahela Nav. Co. v. United States, 148 U.S. 312, 336, 13 S.Ct. 622, 37 L.Ed. 463.

We therefore cannot adopt the plaintiff's construction of section 23 that the Commission has jurisdiction over non-navigable streams under the interstate commerce clause irrespective of the interests of navigation. It is argued that if the river in the vicinity of Radford is locally navigable (even though not navigable interstate) and if goods can be carried on the river there to the railroad for further carriage in interstate commerce, then Congress has the power to *regulate the river* as an instrumentality of interstate commerce. As there is no such commerce on the river, and has been none for many years, with no likelihood of any in the future, the contention seems only theoretical. But apart from this the proposition is not sound in our opinion. We know of no authority to support it, and it runs counter to the established principles above stated. If the river is not navigable interstate, its control and use (except that down-stream navigability of other waters of the United States may not be impaired), is subject to the laws of the

State, and not of the federal government. If it can be assumed that the suggested possibility of keelboat use of the river would be of sufficient importance to be worthy of regulation by Congress as a part of interstate commerce, and therefore the keelboats themselves and the rates charged by them, could be subjected to federal regulation as in the case of the railroads, it does not follow that the use of the *river,* which is subject to state laws and control, could likewise be so regulated. Congress could of course purchase or condemn the river or riparian rights thereon and convert it into a highway for or instrumentality of interstate commerce, but only upon payment of just compensation. To prohibit the use of the river for a dam or other purpose lawful under state laws, irrespective of navigation, would be taking property without compensation. The Daniel Ball, 10 Wall. 557, 562, 19 L.Ed. 999, supra, is referred to in support of the plaintiff's contention, but we do not so read it. There a vessel was held subject to the navigation laws requiring a license, because she was operated *on a navigable river of the United States* within the definition then given and always since followed. It was held no defense that she did not herself ply interstate when her carriage was of goods destined for interstate transportation in connection with railroads. So here it may be assumed that Congress could validly require the keelboats to be licensed; but that is quite a different proposition from asserting federal control over state waters and denying the exercise of property rights thereon without compensation.

The construction now contended for by the Commission will obviously have a very important effect on the rights of the States of Virginia and West Virginia. Both states by their respective Attorneys General have filed briefs as *amici curiae* in opposition thereto. The question is of great importance to them because it is said that there are many non-navigable mountain streams in the two states which though useless for purposes of navigation are of great value in the development of hydro-electric power; and both states years ago legislated upon the subject of water power development.[11]

The statutes of both states have provisions generally similar to the conditions in the federal statute with respect to rates and "recapture" at the end of a fifty-year license period. Both states contend that with respect to such matters they have full power and control as internal affairs of the state reserved to them under the 10th Amendment, U.S.C.A. Reduced to simplest form, the vital question is whether the states or the national government ultimately are entitled to become the owner of these hydro-electric power plants on non-navigable waters. Both states take the position that New River is not navigable, either in Virginia or West Virginia, and both deny that the Federal Power Commission has any constitutional authority to impose its regulatory license on the Radford Dam or any other dam on the New River. In the brief for the State of Virginia the seriousness of the Commission's contention as it affects the State is stated as follows:

"The Federal Power Act, if construed as contended for by the appellant, amounts to a virtual prohibition of the development of Virginia's water powers by private investors, as well as by the State itself."

And it is further pointed out that the mere construction of the plant and the generation of electricity therein does not of itself constitute interstate commerce, but is within the local control of the State. Utah Power & Light Co. v. Pfost, 286 U.S. 165, 181, 52 S.Ct. 548, 76 L.Ed. 1038.

Both States contend, as does also the defendant in this case, that whether the river is navigable or not, the conditions of the license not related to navigation cannot validly be imposed by the Commission because they relate to matters within the control of the State. The Supreme Court has not yet passed upon this question arising under this important federal Act, although it was apparently raised in two cases which have been dismissed for want of jurisdiction. United States v. West Virginia, 295 U.S. 463, 55 S.Ct. 789, 79 L.Ed. 1546; New Jersey v. Sargent, 269 U.S. 328, 46 S.Ct. 122, 70 L.Ed. 289.[12] As we think the district judge correctly found that New River was not navigable, it is unnecessary

---

[11] See Michie's Code of Virginia, 1936, §§ 3581(1) to 3581(16); West Virginia Acts of 1915, Ch. 17.

[12] The Water Power Act was held constitutional as an act for improvement of navigation in Alabama Power Co. v. Gulf Power Co., D.C.Ala., 283 F. 606; and in

State of Missouri v. Union El. L. & P. Co., D.C.Mo., 42 F.2d 692; see also Henry Ford & Son, Inc., v. Little Falls Fibre Co., 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483; United States v. Central Stockholders' Corp., D.C.Cal., 43 F.2d 977.

to determine that question here. There is no challenge in this case to the full power of the United States to impose such conditions with respect to dams erected in streams over which it has full property jurisdiction; nor is there any question in this case as to the right of a State to impose such conditions with respect to hydroelectric plants erected under its authority. Fox River Paper Co. v. Railroad Comm. of Wisconsin, 274 U.S. 651, 47 S.Ct. 669, 71 L.Ed. 1279.

With respect to federally navigable waters the regulatory authority of Congress is plenary; but with respect to non-navigable waters, where a structure therein may prejudicially affect other navigable waters, the power of Congress is protective and preventive rather than directly regulatory; and in the latter case, as between the federal and state governments we are of the opinion that the Power Commission has no valid authority to impose conditions which in effect give the ultimate right of ownership of hydro-electric projects in state waters to the United States and thus take it from the state. If the United States wishes to acquire the property for a proper federal purpose, it must pay just compensation therefor. Of course when the electric power locally produced is transmitted in interstate commerce it comes within the proper field of control of the federal government under the interstate commerce power, with respect to which Congress has recently very fully legislated in the Federal Power Act of August 26, 1935, 49 Stat. 853, now codified as Parts 2 and 3, § 824 et seq. of 16 U.S.C., 16 U.S.C.A. § 824 et seq.

It is apparent that the issues of law and fact in this case have taken a much wider range than the essential controversy between the Commission and the Company. There is obviously no real dispute between the parties as to the construction of the dam itself as affecting navigation. The plans for the structure have been approved from the standpoint of navigation; and with respect to possible effect on navigation from operations of the dam, the Company expressed its willingness to accept a license which subjected it to all proper conditions affecting navigation. Whether the Company operates a dam under a license with such conditions or without a license is of no great importance with respect to the actual operation of the dam because, as a matter of law, it must be operated with due observance of the rights of other riparian owners on the stream, and also in a way that will not prejudice navigable capacity of other down-stream waters; and if the Company fails at any time in its duties in this respect, the government as well as other riparian owners would be clearly entitled to appropriate injunctive relief. The only dispute between the parties was as to the power of the Commission to insist on financial and economic conditions which had no relation to navigation.

In these circumstances the court is asked to issue an injunction on the theory of protecting a navigation which the action of the government clearly shows needs no such protection. It appears the dam is now nearing completion. The alternative prayer of the bill is for a mandatory injunction to require the removal of the dam, which is obviously not really desired by anybody. The only practical effect of the issuance of the injunction at this time would be to force the defendant Company, in lieu of removal of the dam, to accept a license with conditions as to property rights which, under the facts of the case, are properly subject to the regulatory laws of the State and not of the federal government. The issuance of an injunction by a court of equity is an extraordinary remedy which should not be granted when, under all the circumstances of the case, it would seem inequitable to do so.

We conclude, therefore, that the judgment in this case must be

Affirmed.

PARKER, Circuit Judge (dissenting).

This suit was instituted by the United States, under the provisions of the Rivers and Harbors Act and the Federal Power Act, to enjoin the erection and operation of a power dam in New River near Radford, Virginia, otherwise than under a license from the Federal Power Commission. The defendant is constructing at the site mentioned one of the thirty water power plants in this country of exceeding 100,000 horse power. In 1925, the New River Development Co., the predecessor of defendant, filed with the Commission "declaration of intention" to construct the dam, pursuant to sec. 23 of the Federal Water Power Act, 16 U.S.C.A. § 817. In 1926, defendant, having acquired the property of the New River Development Company and taken an assignment of the "declaration of

intention", applied to the Commission for a license under the act authorizing the construction of the project. In 1927, the Commission, having made an investigation, found that New River in the part involved was not "navigable waters" within the definition of the Water Power Act, but that "the interests of interstate or foreign commerce" would be affected by the construction, and thereupon tendered defendant a standard or major form license in accordance with the provisions of the act, 16 U.S.C.A. § 803. This license defendant refused to accept. In 1930, defendant requested the Commission to reconsider its action taken in 1927 and to disclaim jurisdiction over the proposed development or, alternatively, to issue a "minor part" license pursuant to sec. 10(i) of the act. In 1931, this request of defendant was denied, a standard form license was tendered and it was ordered that defendant not proceed with construction until it should have received and accepted such license. In 1932, the Commission re-examined the question of the navigability of New River and found it to be navigable from Wilson's Creek north, which includes the site of the proposed dam.

Defendant sued the members of the Commission to enjoin the enforcement of the provisions of the Water Power Act with respect to the project, but we held that the District Court was without jurisdiction to entertain that suit. Appalachian Electric Power Co. v. Smith, 4 Cir., 67 F.2d 451. Defendant then began the construction of the dam and this suit was instituted by the United States to enjoin its construction or operation without the acceptance of the license which the Power Commission had tendered. The court below held that the New River was not navigable; that the erection and operation of the dam would not impair the navigable capacity of other waters; and that, even if the latter were not the case, no license is required under the act for the erection of a dam in waters which are not navigable. The bill of complaint was accordingly dismissed; and the United States has appealed.

There has been much argument as to the proper interpretation of the Federal Power Act as to construction of this character; but I think that the meaning of the act is clear. Prior to the passage of the act, the Rivers and Harbors Acts of 1890 and 1899, 26 Stat. 454 and 30 Stat. 1151, 33 U.S.C.A. § 401 et seq., forbade the construction, without the consent of Congress, of any bridge, dam etc. in any navigable water of the United States or the creation of any obstruction to the navigable capacity of the waters of the United States. In United States v. Rio Grande Dam & Irrigation Company, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, it was held that the construction of a dam in a non-navigable portion of a river which would interfere with the navigable capacity of the navigable portion was forbidden by this legislation and that for that reason the construction of such a dam would be enjoined in a suit by the United States. One of the purposes of the Federal Water Power Act of 1920, as amended by the Federal Power Act of 1935, was to clothe the Federal Power Commission with authority to grant licenses for the construction of dams which could not be constructed under existing law without the authority of Congress. As to dams in navigable waters, authority was granted by sec. 4(d) of the act. There still remained, however, the obstruction to navigable capacity which might arise from construction in non-navigable streams, and which was forbidden by sec. 10 of the Rivers and Harbors Act; and to take care of this situation the following provision was inserted in sec. 23 of the Act of 1920, viz.:

"That any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined herein [in this chapter] as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States, may in their discretion file declaration of such intention with the commission, whereupon the commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not proceed with such construction until it shall have applied for and shall have received a license under the provisions of this Act [chapter]. If the commission shall not so find, and if no public lands or reservations are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws."

The purpose of this was to give any person about to construct a dam or other project in a non-navigable stream opportunity to have determined, in advance of construction, the question as to whether such project would affect the interests of interstate or foreign commerce. If so, a license would be granted, as in the case of a project constructed in navigable waters. If not, the project might be constructed without license. As the power of the United States to forbid such construction in any case arises from the power to prevent the obstruction of navigable waters which are highways of commerce, the finding that the interests of interstate or foreign commerce will or will not be affected necessarily means that the structure will or will not impair the navigable capacity of any navigable waters in such way as to affect such commerce. The impairment of a theoretical navigable capacity would not constitute a basis for requiring a license if the interests of commerce were not affected; but the interests of commerce would be affected within the meaning of the act if there were an impairment of navigable capacity which would affect commerce. The amendment of this section made by the Act of 1935, instead of leaving the declaration of intention optional, requires that it be filed in all cases where the construction, while in a non-navigable stream, will affect the interests of interstate or foreign commerce by its effect on the navigability of other waters. One proposing a construction which will have no such effect does not, of course, come within the provisions of the act.

Three questions, therefore, arise for our consideration upon the appeal: (1) Whether New River at the site of the proposed construction is a navigable stream; (2) if not, whether the proposed construction will affect the navigability of waters of the United States which are navigable; and (3) whether, in either case, the requirement of the license tendered the defendant is within the power of Congress. I think that all of these questions should be answered in the affirmative.

### The Navigability of New River.

In considering the navigability of New River, we may disregard the portions above Allisonia, Virginia, and below Hinton, W. Va.; and, as to these portions, it may be assumed that the stream is non-navigable. I think, however, that the 110 mile stretch extending across the Appalachian Plateau from Allisonia to Hinton is clearly shown to be navigable. The 26 mile stretch above Hinton to Wylie's Falls, Va., and the 25 mile stretch above Radford are unquestionably navigable and were so found by the court below. They were improved for purposes of navigation by the federal government in the 1880s; and the evidence shows that they were used for purposes of navigation before as well as after these improvements were made. The intervening stretch between Wylie's Falls and Radford was not used to the same extent; but the evidence shows that substantial use was made of it and the conclusion is justified that it was not used to a greater extent because it was paralleled by a railway which furnished a more desirable means of transportation. The stretches above Hinton and above Radford were used as means of transportation to the railways at those points; but after the Cripple Creek branch of the N. & W. Railway was built in the 80s paralleling the river above Radford, it took the traffic from the river, and even this stretch, which had been improved by the government, was used but little.

The river throughout this 110 mile stretch has an abundance of water. The average stream flow at the site of defendant's project a few miles above Radford is 3211 cubic feet per second and the drainage area of the river at this point is 2400 square miles. River vessels can navigate in water having a rate of flow of 5 or 6 miles per hour, whereas the rate of flow of this river is one mile per hour in the pool water and not exceeding a maximum of 4.4 miles per hour in the channels of the falls or rapids. It is true of the unimproved portion of the river between Radford and Wylie's Shoals, as it is of the improved portions, that 85 per cent of the distance consists of pools of a navigable depth of several feet, whereas the rapids or shoals which account for the remainder of the distance are traversed by natural channels, having a minimum depth of approximately two feet even in low water. These channels have been deepened and widened in the stretches above Hinton and Radford to which we have referred. The average slope of the river is approximately four feet per mile throughout this entire distance and is no greater in the unimproved portion than in the portions that have been improved. There are a number of shoals; but the percentage of shoal water is no greater and the obstruction no more formidable between Radford and Wylie's Shoals than in the portions of the riv-

er which were improved and which were held navigable by the court below. So far as the natural condition of the river is concerned, therefore, I can see no difference in navigability between the portion between Radford and Wylie's Shoals and the stretches above Hinton and Radford.

There can be no question as to the substantial character of the commerce which was carried down the river over the stretches above Radford and Hinton. The boats used in this commerce were bateaux or keel boats having an average length of 60 feet, a width of 6 to 8 feet and a draft of two feet, and capable of carrying a load of 20,000 to 27,000 pounds. There were 17 of these keel boats operating at one time above Hinton and eight above Radford. Lumber and staves in large quantities were carried down the river for shipment by rail at Hinton and pig iron for shipment at Radford. Operation of steamboats was attempted, but was not successful. As to the intervening stretch, there is abundant evidence of operation of keel boats on it before the building of the railroad from Glen Lyn to Radford. The witness Anderson testified (469)* to moving his father's household goods down the river from Eggleston Springs to True in 1879. The witness Collins testified (321-6) to trips with his father down the river from Radford to Hinton and of stops on the trips at the Narrows and at Crump's Bottom, also that he had seen cross ties and staves brought by boat from the Narrows to Hinton, and that he had rafted timber and logs down the river. The witness Dickenson (420–25) testified as to supplies being carried up the river by boat from Hinton to Shumate's Falls and thence by wagon to Glen Lyn. The witness Flannagan testified that the keel boats plied up and down the river from Hinton to Allisonia (303–6). The witness Helvey testified to grain being carried by boat up the river from the horseshoe to Radford and of the use of boats in the river (458–460). The witness Hoover testified to shipping supplies by boat from Hinton to the camp of the railroad contractors at East River or Glen Lyn (447). The witness Linkous, when a boy and living at Pepper Tunnel below Radford, had seen boats going up and down the river operated by former slaves whose names he remembered. He remembered also selling eggs to the boatmen and their custom of blowing a bugle as they passed, (311).

The witness Martin who lived at Eggleston testified to working in a boat on the river and carrying it up the river to Radford and selling it (465). The witness Price who lived near Tom's Creek when a boy saw boats going up and down the river loaded with coal, corn, wheat, crated chickens, hogs and produce of all sorts (401–405). The witness Skeen, a Confederate veteran, testified that while camped at the Narrows he saw boats going up and down the river, bringing provisions to the commissary at the Narrows (399). The witness Snidow who lived at Pembroke six miles below Eggleston testified to seeing the boats operating on the river during the Civil War, and of the management of the boats by a Captain Burke, and of how the boats, 4 or 6 in number, were loaded with grain and sent down the river (364-6). The witness Snodgrass who lived at Eggleston saw boats operated in the river and saw them bring supplies down the river to the railroad contractors (370–3). The witness Snyder saw boats operated between Radford, Eggleston and the Narrows during the Civil War loaded with supplies for the soldiers. He testified also that after the War his father operated a boat, going as far down the river as Hinton (346–50). The witness Webb who lived at the Horse Shoe on New River saw boats going up and down the river and heard the boatmen say that they went as far as Hinton (327). He testified that for several years after the Civil War the barges were operated by hired hands and hauled wheat and lumber (328). The witness Coleman operated a steamboat for six or seven months from Pepper's Ferry to Pepper's Tunnel (306). The witness Jones testified to bringing logs by raft or loose down the river from Narrows to Hinton (378). The witness Medley testified to working in bateaux in the river from Hinton to Mercer's salt works and from there to Radford, of bringing fertilizer from Glen Lyn to the salt works, of bringing staves from Wylie's Island, and of moving a man's household goods up the river to Radford (412–13). The witness Owen testified to carrying the government boats which had been engaged in the river work above Radford down the river to Hinton where they were sold (337). The witness Peters testified to hauling tobacco by boat from Glen Lyn to Hinton for shipment by rail (390). He also testified that he worked on the river in boats

*References are to Vol. 2 of appellant's appendix.

for 16 or 18 years, that in the Spring he would go up the river to Glen Lyn to get fertilizer, and that while the N. & W. R. R. was in process of construction he went up nearly every week (385). The witness E. M. Smith testified to working on river boats for 9 years and carrying groceries and other merchandise to Glen Lyn and carrying lumber, staves, tobacco and tan-bark down stream (428). The witness Weiss testified to the operation of one of the keel bottom boats by his brother and of his hauling staves and other things from Glen Lyn to Hinton (331).

The foregoing testimony is not contra-dicted nor discredited, and I do not under-stand that the District Judge rejected it. On the contrary he accepted it but failed to appraise it properly, saying: "It is not meant to say that continuous movement of such boats between Hinton and the vicinity of Radford was impossible or did not occur. There is evidence which indi-cates that it did occur, but there is a vagueness about the extent to which it occurred and indications that such trips were irregular, were attended with diffi-culty and formed no appreciable part of any commercial transportation which took place on the river." To my mind this tes-timony establishes beyond question not only the navigable capacity of the river for the purposes of useful commerce, but also that it was in fact navigated and used as a highway of commerce. That a consid-erable portion of the commerce was in-terstate in character does not admit of doubt; but, even if this were not true, the use made of the stream shows conclusive-ly that it was capable of serving as a high-way for such commerce between Allisonia and Hinton for river boats of light draft, such as were undoubtedly in regular use on the river prior to the coming of the railroads.

The fact that Congress has dealt with this portion of New River as a navigable water of the United States, while not con-clusive, is a circumstance of great weight to be considered by the court. U. S. v. Brewer-Elliott Oil & Gas Co., D.C., 249 F. 609, 618. And contemporaneous re-ports made to Congress show unquestion-ably the navigable character of the stream. Thus the report of Colonel, then Major, Craighill attached to the report of the Sec-retary of War in 1873 quotes the follow-ing from a report made in 1819 by Moore and Briggs who made a survey of the river for 54 miles above Hinton under the aus-pices of the Board of Public Works of the State of Virginia:

"This is truly a noble river. Notwith-standing it was represented to us as being remarkably low, yet it afforded (July 1819) a superabundance of water for every pur-pose of internal navigation. The fall in this part of the river, considering the mountainous country it passes through, is comparatively moderate. The principal falls are the Bull Falls, McCaniel's, An-derson's, Wiley's, Neilley's, and Peter's Mountain Falls—none of which have been improved in the least degree, yet we as-cended them all with our boat, though in two or three instances with considerable difficulty, after taking out our baggage, stores, &c."

Col. Craighill's report shows that keel boat traffic existed on the river at that time and recommended improvement of the channel for navigation particularly with reference to connection with the inter-secting interstate railroads. He states:

"But little has been done in the way of improving the river since the time of Moore and Briggs, though an effort is said to have been made in that direction by the confederate government during the late war. Mr. Hutton states that the keel boats now used draw about 12 inches when two-thirds loaded. By the construction of slight deflectors or dams of rock and brush, both of which materials abound, the vol-ume of the water may be concentrated and the depth over the shoals increased from the present average of about 12 inches to about 2 feet, without too much increase of velocity of current. Some of the falls, which are almost always vertical and of an average height of about 4 feet, could be greatly improved by blasting sluices through them, about 30 feet in width, and of an average length of 50 feet. It is to be observed that the falls have in many cases natural chutes or sluices through them, susceptible, also, of such improve-ment as that just indicated.

"What has been said above refers to a keel boat navigation, but the pressure for the improvement of this river is increased by the development of the railroads which intersect it and afford the means of rapid transport east and west for the commodi-ties to be procured along and near the stream. There is a demand for the steam navigation."

The Hutton report attached to the report of Col. Craighill contains a mile by mile description of the character of the stream from the Lead Mines to Hinton, a distance of 128 miles, and refers in the following terms to the commerce on the river and the extent of the improvement contemplated:

"The present system of transportation on this portion of the river is by keel boats which carry from two to three tons, and are rowed or floated down the river and poled up. An expenditure of $100,000 would greatly ameliorate the condition of the river for this trade, and enable the trips to be made with so much more certainty as to induce a considerable increase of trade."

The report of the Chief of Engineers for the year 1877 showed the existence of keel boat traffic, and that its improvement above Radford (New River Bridge) was for the purpose of facilitating traffic connecting with the interstate railroad which crossed the river at that point. The report states:

"The first appropriation for the work was $15,000, August 14, 1876; but it was not made available until May 1877. As this appropriation was insufficient for a general improvement, it seemed necessary to confine what should be done at present to a limited portion of the river, and to that scheme which involved the least expense, viz, *for the keel boats now in use,* it being the understanding that what is first done in the smaller improvement should be arranged with a view to its utilization and adaptation some future day, when the means provided shall suffice to enter upon the improvement of the river for light steamboats.

"It seemed also expedient that the first portions of the river treated should be in the vicinity of New River Bridge, in order to facilitate communication of at least a portion of the country through which the river flows with an existing outlet east and west—the Virginia and Tennessee Railroad—which is itself in connection with the whole system of rail and water intercommunication of the country." (Italics supplied.)

The report of the Chief of Engineers for the year 1880 contains the following statement:

"In August, 1878, it was decided to commence work at once on the section of the river immediately above the mouth of Greenbrier, at Hinton, in West Virginia, as the indications of immediate usefulness of the improved river in that section seemed greater than in the section worked over by Captain Cuyler. The operations near Hinton were placed under the supervision of Mr. A. M. Scott, and vigorously continued until near the end of November, 1878. The work was resumed in June, 1879, under Col. William Proctor Smith. The reports of Mr. Scott and Colonel Smith in the annual report for 1879, and hereto appended, give the detailed history of the progress made up to June 30, 1880. A steamboat has been built at Hinton and runs on the river, taking advantage of the improvement as high as it has been carried above that point, about 15 miles. The bateaux have much greater ease in navigation and can carry larger loads."

The work done by the government was in three divisions: the Lower or Greenbrier division, extending 86½ miles from Hinton to Radford, the Middle or New River Bridge division extending 43 miles above Radford, and the Upper or Lead Mines division, extending for 62 miles. The last named division was far above the section of the river with which we are dealing and was the section referred to in the Craighill report recommending abandonment of the work and quoted by the court below. The reports show that on the lower and middle divisions there was substantial traffic, which was increased as a result of the work done. The following statement is contained in a report of 1881:

"On the lower division there are thirteen keel boats and a small side-wheel steamboat, 75 feet long, 10 feet wide, and 3 feet deep, with another 100 feet long and 15 feet wide being built. Four of the keel boats run up to Shumate's Falls, 28 miles, carrying supplies to the New and East River Railroads.

"On the middle division there are eight keel boats and parties are about to build a small tugboat and a light-draught steamboat to carry ores down to New River Bridge.

"The tables following show that of the freight shipped from the stations on the Chesapeake and Ohio Railway, which are outlets to the river on the lower division, 70 per cent is from New River, an increase over 1880 of 36½ percent.

"The shipments from the various stations on the Norfolk and Western Railroad show an increase of 33 per cent. The

shipments by river to New River Bridge Station began too late in December for any freight to be sent by rail."

The following is in a report of 1883:

"It has hardly been practicable to accomplish at any one of the very many points needing improvement all that has been desirable, but the worst places have been worked upon to the greatest extent, and efforts thus been made to increase the available navigability of the river over as long stretches as possible, and to increase the facilities for access of the greatest number to the railroads touching the river, and thus connecting with the eastern and western markets districts otherwise much isolated and hitherto dependent on teaming to railroad stations over long and bad roads.

"Should work be resumed, it will be found difficult to collect and organize as efficient a force as that which has been disbanded and necessarily scattered. To replace such a machine takes time and money.

"The number of large boats on the river for carrying freight has increased to twenty-five. The following important facts are taken from the report of the superintending engineer:

"Of the freight sent from Hinton in 1882, 95 per cent came from New River, an increase over 1881 of 46 per cent.

"Of the freight received at Hinton in 1882, 43 percent went up the river; 24½ percent increase on shipments from Hinton in 1882 over 1881; 9 per cent increase on freight received at Hinton in 1882 over 1881.

\* \* \*

"The navigation of the river not being continuous as yet, it is practically a feeder to the railroads which cross it and run along portions of it. It has also been of much use in carrying materials and supplies to the railroads while in process of construction near it. It is probable that when the river is fully improved boats will transport one-third of the products of the fine agricultural country through which it flows, and seven-eighths of those of the mines, exclusive of coal."

To the report of the Secretary of War made in 1913 is appended a report of the District Engineer who investigated the feasibility of further improvement of the river, containing the following statement:

"Above Glen Lyn the river is paralleled most of the way by two railroads, and there is no river commerce. From Hinton to Glen Lyn, a distance of 30 miles, there is some commerce, consisting of lumber, staves, sand, gravel, and also some grain, hay, farm products, and miscellaneous merchandise. No statistics are on hand, but I am informed that the commerce at Hinton amounts to about two railroad carloads per day, and, as Hinton is the only town on this 30-mile section, this is some measure of its amount. This estimate of two carloads a day is thought to be excessive and is believed to be true only at times. In 1883 there were about 17 keel boats in this traffic, and there are said to be 10 or 12 such boats now on the river. These keel boats, as they are called, are the popular boats for this traffic, having an average length of 60 feet, width of 6 to 8 feet, and carrying 20,000 to 27,000 pounds. Their draft is generally about 2 feet. The commerce is altogether local. During the winter season, from December 1 to April 1, the roads are in poor condition, and the inhabitants experience difficulty in transportation of supplies. The section from Glen Lyn to Hinton lies almost entirely in Summers County and only traverses about one-half of it. Summers County had a population, at the last census, of 18,420. Probably no more than 2,000 or 3,000 people at most are in any way dependent upon this section of the river. The improvement of the river would probably cause a small increase in commerce, but not a very large one, as there is nothing to move."

In the light of this evidence I do not think that a finding of navigability can be avoided. The question is not whether modern steamboats are using or can use the river, but whether it is susceptible of use by any sort of craft used for commercial purposes. As said by the Supreme Court in The Montello, 20 Wall. 430, 441, 22 L.Ed. 391:

"It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any

kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river. It is not, however, as Chief Justice Shaw said (Rowe v. Granite Bridge Corp., 21 Pick. [Mass.] 344), 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture.' "

The fact that shoals and rapids in the river made navigation difficult and prevented the adoption of modern agencies of navigation is not conclusive of non-navigability. The same situation confronted the court in The Montello, supra, where the court said:

"The learned judge of the court below rested his decision against the navigability of the Fox River below the De Pere Rapids chiefly on the ground that there were, before the river was improved, obstructions to an unbroken navigation. This is true, and these obstructions rendered the navigation difficult, and prevented the adoption of the modern agencies by which commerce is conducted. But, with these difficulties in the way, commerce was successfully carried on, for it is in proof that the products of other States and countries were taken up the river in its natural state from Green Bay to Fort Winnebago, and return cargoes of lead and furs obtained. And the customary means by which this was done, was Durham boats. As early as May, 1838, a regular line of these boats [was] advertised to run from Green Bay to the Wisconsin portage. Doty v. Strong, 1 Pin. (Wis.) [313] 316 [40 Am.Dec. 773]. But there were difficulties in the way of rapid navigation even with Durham boats, and these difficulties are recognized in the Ordinance of 1787, for not only were the 'navigable waters' declared free, but also the 'carrying places' between them, that is, places where boats must be partially or wholly unloaded and their cargoes carried on land to a greater or less distance. Apart from this, however, the rule laid down by the district judge as a test of navigability can not be adopted, for it would exclude many of the great rivers of the country which were so interrupted by rapids as to require artificial means to enable them to be navigated without break. Indeed, there are but few of our fresh water rivers which did not originally present serious obstructions to an uninterrupted navigation. In some cases, like the Fox River, they may be so great while they last as to prevent the use of the best instrumentalities for carrying on commerce, but the vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so, the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers, such as rapids and sand-bars."

And the fact that the river has been used for purposes of commerce establishes its navigability, even though its use may have been discontinued as a result of more improved methods of transportation. What was said by the Supreme Court in Economy Light & Power Co. v. United States, 256 U.S. 113, 123, 41 S.Ct. 409, 413, 65 L.Ed. 847, is conclusive of this point. The Court said:

"We concur in the opinion of the Circuit Court of Appeals that a river having actual navigable capacity in its natural state and capable of carrying commerce among the states is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce, and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions. And we agree that the provisions of section 9 of the Act of 1899 (30 Stat. 1151) apply to such a stream. The act in terms applies to 'any * * * navigable river, or other navigable water of the United States'; and, without doing violence to its manifest purpose, we cannot limit its prohibition to such navigable waters as were, at the time of its passage, or now are, actually open for use. The Desplaines river, after being of practical service as a highway of commerce for a century and a half, fell into disuse, partly through changes in the course of trade or methods of navigation, or changes in its own condition, partly as the result of artificial obstructions. In consequence, it has been out of use for a hundred years; but a hundred years is a brief space in the life of a nation. Improvements in the methods of water transportation or increased cost in other methods of transportation may restore the usefulness of this stream; since it is a natural

interstate waterway, it is within the power of Congress to improve it at the public expense; and it is not difficult to believe that many other streams are in like condition and require only the exertion of federal control to make them again important avenues of commerce among the states. If they are to be abandoned, it' is for Congress, not the courts, so to declare. The policy of Congress is clearly evidenced in the act of 1899, and, in the present case at least, nothing remains but to give effect to it."

Certainly the New River between Allisonia, Va., and Hinton, W. Va., is as clearly navigable as was the Fox River held navigable in The Montello, supra, or the Desplaines River held navigable in Economy Light and Power Co. v. United States, supra, or the sections of the Green, Grand and Colorado Rivers, held navigable in United States v. Utah, 283 U.S. 64, 51 S. Ct. 438, 75 L.Ed. 844, or the Tennessee River at the site of the Wilson dam, held navigable in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 328, 56 S.Ct. 466, 80 L.Ed. 688. In the case last cited the court adverted to obstructions at various points because of "shoals, reefs and rapids" and to the fact that in its present condition the river was not adequately improved for commercial navigation and the traffic on it was small, but held it navigable nevertheless. Little light is thrown on the case by the decisions in Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L. Ed. 914, or United States v. Doughton, 4 Cir., 62 F.2d 936. In the first of these cases, the Supreme Court dealt with Red Pass, a crevasse caused by the overflow of water from the Mississippi, upon which no commerce of any sort had ever been conducted. In the second, this court dealt with Wilkerson's Creek as to which the same situation existed.

But there is another and equally valid reason why the New River must be held a navigable water of the United States at the site of the proposed dam. Whatever may be found as to other portions of the river, there can be no question that the dam is located on a portion which is navigable, which has been improved for navigation by the federal government, and which has been used as a highway for interstate commerce through connection with the interstate railway which crosses the river at Radford. Whether this navigable stretch of the river extends into another state or not, therefore, it furnishes in connection with the railroad a highway of interstate commerce, has been used for that purpose and is a water of the United States subject to the control of Congress for that reason. In the Daniel Ball, 10 Wall. 55, 565, 19 L.Ed. 999, the navigation laws were applied to a steamboat operating on the Grand River entirely within the State of Michigan. It was contended that the vessel was not subject to the navigation laws even though operated upon a navigable river of the United States, because she did not carry merchandise beyond the boundaries of the state and was not operated in connection with any line of vessels or railway. It was held, however, that the vessel was subject to the control of Congress, because the articles that she carried were moving in an interstate journey. The court said:

"In this case it is admitted that the steamer was engaged in shipping and transporting, down Grand River, goods destined and marked for other States than Michigan, and in receiving and transporting up the river goods brought within the State from without its limits; but. inasmuch as her agency in the transportation was entirely within the limits of the State, and she did not run in connection with, or in continuation of, any line of vessels or railway leading to other States, it is contended that she was engaged entirely in domestic commerce. But this conclusion does not follow. So far as she was employed in transporting goods destined for other States, or goods brought from without the limits of Michigan and destined to places within that State, she was engaged in commerce between the States, and however limited that commerce may have been, she was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce; for whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of Congress."

It is the movement of commerce interstate which makes the commerce clause of

the Constitution applicable. Any instrumentality of such commerce is subject to the control of Congress; and a body of water, even though entirely within the limits of a state, falls within the principle if interstate commerce moves over it. Here the stretch of the river for 25 miles above Radford furnished a highway for such commerce. Congress recognized the fact and expended money in its improvement. And Congress has done nothing to surrender the control which it thus saw fit to exercise.

I am familiar with the statement of the rule as to navigability which contains the expression that "they constitute navigable waters of the United States * * * when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water." I do not think, however, that this statement was intended to limit the power of Congress over a stream which is in fact a highway of interstate commerce moving partly by rail. There can be no question as to the power of Congress over an intrastate railroad over which interstate commerce moves. Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878. And there can be no difference in principle with respect to a stretch of water wholly within a state which serves as a highway for interstate commerce. A different question would be presented if an intrastate stretch of water capable of use in interstate commerce had never been used for that purpose. Here, however, the waterway has been used in connection with a railway as a highway of interstate commerce and to that end has been improved by Congress through expenditure of moneys of the United States.

### The Effect on Navigation.

The power project of defendant is one of the larger projects of the country. The dam is 110 feet high, with a draw down of 27 feet, and the machinery has capacity for utilizing a flow of 9,000 cubic feet of water per second, or approximately three times the average flow of the stream. Peak load or near peak load operation is contemplated, i. e. the water will be permitted to flow through the turbines for only a part of each twenty-four hours to take care of the higher demand for electricity which exists for only part of the day. This necessarily means that the flow of the stream will be almost entirely shut off for a portion of the day and the volume of water released will be greatly in excess of normal stream flow while the turbines are operating. This will cause waves in the stream below the dam which will persist far down the river and will even cause the rise and fall of the Kanawha at the head of navigation on that river. In dry weather when the flow is low, it will be possible to shut off the stream flow for long periods and affect the navigability to a marked degree.

The question as to whether the operation of the dam will affect the navigable capacity of an interstate stream, disregarding the navigable capacity at the dam site, is easily disposed of if regard be had to the interstate stretch of the river between Glen Lyn, Va., or Wylie's Falls, Va., and Hinton, W. Va. That this stretch of the river is navigable does not seem to me to admit of doubt. Millions of feet of lumber and staves were transported over it, and it was improved by the federal government. The improvement extended from Hinton, W. Va., to beyond the Virginia line at Wylie's Falls. That there was commerce on the river as far up as Glen Lyn is proven beyond all reasonable doubt and is referred to in the government reports. Whatever may be the effect of the operation of the dam on the Kanawha, there can be no question but that it will affect the navigability of New River from Glen Lyn to Hinton. Counsel for defendant admit this but contend that the stretch of the river is not navigable. As stated, however, I think that the showing as to its navigability is beyond question.

And I think that we must consider the effect which the operation of the dam might have upon the navigability of the Kanawha. It is said that this need not be considered because of the rectifying effects of the dams farther down stream and of the Bluestone flood control project, the construction of which is virtually assured. The power of Congress to control the construction of a dam which may affect the navigation of a stream is not affected by the existence of dams lower down stream, for these might be removed. The servitude in the interest of navigation must be determined by consideration of the stream in its natural condition. United

States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746. A corollary of this is that the power of Congress to control stream flow of navigable streams is not impaired as the result of construction which may render the exercise of the power unnecessary. It is argued, also, that it would not be wise from the standpoint of its own interests for defendant to operate its dam in such way as to interfere with the navigable capacity of the streams below; but the fact that the structure is of such character that it is capable of being operated so as to affect navigation brings it within the regulatory power of Congress. It is clear that, in such case, the government need not depend upon the wisdom or public spirit of private persons to protect the interests of navigation but may itself take action which will guarantee their protection.

But more important than any of the other effects which the construction and operation of the dam will have on the navigability of navigable waters is the effect that it will have upon navigation in the Ohio River as a result of effecting means of controlling flood waters in the Kanawha. One of the most important enterprises of the federal government is flood control in the Ohio. While this is important from the standpoint of protecting navigation in the Ohio, and while federal power in the premises is based upon this consideration, its importance to the people of the United States far transcends the mere matter of navigation in view of the tremendous loss of life and property which these floods entail. To adequately control the floods, the federal government must provide for flood control in the various tributaries of the Ohio; and control is nowhere more important than in the New and Kanawha Rivers, which pour into the Ohio waters from a large portion of the mountainous section of Virginia and West Virginia. It appears from the record that the New River furnishes at ordinary times nearly one-fourth of the stream flow of the Ohio below the mouth of the Kanawha; and in rainy season flood waters from the mountains pour down New River through the Kanawha and into the Ohio in tremendous volume. To aid in the control of these flood waters, dams in the New River are imperative; and the Bluestone project near Hinton is being undertaken primarily as a means of flood control. Other dams above

Bluestone, if properly constructed and operated, will aid in flood control and will affect navigation in the Ohio in that way.

It is argued that the dam of defendant can be of aid in flood control, and this is no doubt true; but the argument concedes that the construction and operation of the dam will affect navigation since it will affect flood control. Whether the effect will be favorable or not depends upon how the dam is operated. In the operation of flood control dams, the object is to keep the pond as low as possible at all times so as to provide readily available storage for flood waters when they come. In the operation of power dams, the object is to keep the pond as nearly full as possible at all times so as to have maximum power available. It is clear, therefore, that the construction and operation of power dams can vitally affect flood control in the river; and that, when the construction of such dams is permitted in a river where flood control is as important as it is in New River, they should be subject to the control of the federal government so that they can be operated in connection with the purely flood control dams, as a unitary system.

### The Power of Congress to Require the License.

In the Power Act, Congress substituted administrative for direct legislative and judicial control, i. e. instead of forbidding absolutely the construction of dams in navigable waters or dams which would affect the navigable capacity of navigable waters, it set up an administrative tribunal and authorized it to license the construction of such dams when found to be in the public interest. There can be no question as to the power of Congress to prohibit absolutely the construction or operation of dams which will interfere with navigation in a navigable stream whether the dam itself be located in a stream which is navigable or non-navigable. United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 775, 43 L.Ed. 1136. The existence of private rights is no more an impediment to the exercise of federal power in the one case than in the other; for, in either case, private rights are held subject to the paramount power of Congress to protect the public interest in interstate commerce, by forbidding any construction that would interfere therewith. Nor does this involve infringement of the rights of the states protected by the Tenth

Amendment to the Constitution, U.S.C.A. As said by the Supreme Court in the Rio Grande case, where rights were asserted under a law of New Mexico to divert waters of the Rio Grande in the non-navigable section of the river:

"Although this power of changing the common-law rule as to streams within its dominion undoubtedly belongs to each state, yet two limitations must be recognized: * * * second, that it is limited by the superior power of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States. In other words, the jurisdiction of the general government over interstate commerce and its natural highways vests in that government the right to take all needed measures to preserve the navigability of the navigable water courses of the country, even against any state action.

* * *

"It is urged that the true construction of this act limits its applicability to obstructions in the navigable portion of a navigable stream, and that as it appears that, although the Rio Grande may be navigable for a certain distance above its mouth, it is not navigable in the territory of New Mexico, this statute has no applicability. The language is general, and must be given full scope. It is not a prohibition of any obstruction to the navigation, but any obstruction to the navigable capacity, and anything, wherever done or however done, within the limits of the jurisdiction of the United States, which tends to destroy the navigable capacity of one of the navigable waters of the United States, is within the terms of the prohibition. Evidently congress perceiving that the time had come when the growing interests of commerce required that the navigable waters of the United States should be subjected to the direct control of the national government, and that nothing should be done by any state tending to destroy that navigability without the explicit assent of the national government, enacted the statute in question; and it would be to improperly ignore the scope of this language to limit it to the acts done within the very limits of navigation of a navigable stream."

But the power of Congress is not limited to prohibition of obstructions to interstate commerce. Possessing full power of control in the premises, it may intrust to an administrative agency the regulation and licensing of structures which it has the power to prohibit. And I see no objection to exacting as a condition of the licenses granted a requirement as to the rates to be charged for electric power to be manufactured by the licensees or an option on the part of the government to purchase either at cost or market value. The water power of the streams of the country is one of the most valuable of the natural resources of the people. It does not belong as a matter of private right to the owners of power sites, but can be enjoyed by them only if the government consents to the obstruction or interference with the streams involved in the erection of dams. It is but fitting that the government, which holds its power for the benefit of the whole people, prescribe as a condition of its consent to the erection of such dams that the people shall derive a benefit from the concessions granted, to the extent of being accorded reasonable rates upon the product of the enterprise. And, since no one can foresee the future, or prophesy to what extent such obstructions may become undesirable from the standpoint of the public interest, it is proper that the license for their maintenance be limited and that provision be made for their purchase by the public. The exaction of the right on the part of the government to acquire the project upon the terms contained in the license is in no sense a denial of due process, but is the price exacted by the government for the granting of a permission which it has the right to withhold. Fox River Paper Co. v. Railroad Commission of Wisconsin, 274 U.S. 651, 47 S.Ct. 669, 71 L.Ed. 1279. Nor is it any objection that ownership by the government of the power project may result from such acquisition. If the government may build a power project itself in connection with regulating the navigability of streams, as held in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, there can be no objection to its licensing another to build the project with a view of subsequent acquisition by the government.

If the stream at the dam site be held navigable, there can be no question as to the power of Congress to construct a dam and power project there in aid of navigation. Ashwander v. Tennessee Valley Authority, supra. And it is equally clear that, even if it be non-navigable, it may

810

construct such dam and power project 'for purposes of flood control in streams below. United States v. West Virginia Power Co., 4 Cir., 91 F.2d 611. What the government may thus do itself, it may license a private corporation to do upon such terms and conditions as, in the opinion of Congress, the public interest may require.

Much has been said about the effect of the findings of the Federal Power Commission, but I do not think it necessary to go into this. Assuming that the questions thus raised are jurisdictional and go to the constitutional validity of the action of the Commission, so that they are subject to full review under the doctrine of Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598, I think that the record before the court below fully justifies the Commission's action and that the injunction prayed by the government should be awarded. As a practical matter, this does not mean, of course, that the defendant will be enjoined from constructing or operating the dam, but merely that, as a condition of such construction and operation, it be required to accept the license tendered by the Commission.

There are certain facts in this case which cannot be overlooked. Defendant is constructing one of the thirty largest power dams in the United States, and is constructing it at a place where the river unquestionably has been used as a highway of interstate commerce and has been improved for that purpose by the expenditure of federal funds. The river at the site of the dam has been found a navigable water of the United States by a commission appointed by Congress to deal with such matters and acting under oath in the discharge of a public duty. Even if the river be held non-navigable at the site of the dam, there can be no question but that the operation of the dam will affect the navigability of the stream between Glen Lyn, Va. and Hinton, W. Va., which is navigable within any test which the Supreme Court has prescribed. And, in addition to all this, the construction of dams in New River will vitally affect flood control in the Ohio and thereby affect navigation in that great highway of commerce. Under such circumstances, I cannot agree that the federal government is without power to require a license of defendant as a condition of the construction of the dam, or that the government must await actual interference with existing commerce before taking action.